### PENNSYLVANIA WASTE INDUSTRIES ASSOCIATION, Appellant

### v.

### MONROE COUNTY MUNICIPAL WASTE MANAGEMENT AUTHORITY.

Commonwealth Court of Pennsylvania.

Argued Sept. 11, 2013.

Decided Nov. 21, 2013.

---

Maryanne Garber, Berwyn, for appellant.

H. Clark Connor, Swiftwater, for appellee.

BEFORE: PELLEGRINI, President Judge, McGINLEY, Judge, LEADBETTER, Judge, SIMPSON, Judge, BROBSON, Judge, McCULLOUGH, Judge, and COVEY, Judge.

OPINION BY Judge SIMPSON.

In this appeal of interest to counties and municipal authorities statewide, we are asked whether a municipal authority tasked with planning and implementing municipal waste disposal for Monroe County may set the "tipping fees" at private landfills. These fees cover disposal costs in the landfills as well as administrative costs and costs of other aspects of the county-wide waste disposal plan. Because the municipal authority does not own or operate the landfills which accept Monroe County's municipal waste, our inquiry is more complicated. While we agree with several arguments advanced by the Appellant, we affirm in part the decision of the Court of Common Pleas of Monroe County (trial court), which denied a declaratory challenge to a portion of the fee.

## I. Background

Monroe County Municipal Waste Management Authority (Authority), is a creation of the Municipality Authorities Act (Authorities Act), 53 Pa.C.S. §§ 5601–5623, and is delegated the responsibility for solid waste planning and plan implementation in Monroe County (County) under Section 303(d) of the Municipal Waste Planning, Recycling and Waste Reduction Act (Act 101).[1] In this role the Authority develops and implements an Act 101 Waste Management Plan, which is eventually approved by the County and the Department of Environmental Protection (DEP).

Authority administers an Integrated Waste Management System through the

1. Act of July 28, 1988, P.L. 556, *as amended*, 53 P.S. § 4000.303(d).

Plan in which it requires: 1) that all waste haulers operating in the County are registered; 2) that waste haulers and municipalities provide waste stream reduction data; 3) that municipal solid waste generated in the County be disposed of at permitted waste disposal facilities with which the Authority has negotiated contracts; 4) initiatives for waste stream reduction, including operation and maintenance of the Authority's recycling facility and other community programs for recycling; 5) a litter control and highway deer carcass removal program; 6) a municipal police department which conducts enforcement and assists other law enforcement agencies in such duties; and, 7) the maintenance of staff, equipment, and facilities.

In Act 101, the General Assembly addressed the municipal solid waste industry in order to provide a comprehensive program of ensuring adequate planning and implementation of future disposal capacity as well as encouraging more recycling efforts. Act 101 requires counties to adopt a solid waste management plan and to submit the plan to DEP for approval. Act 101 requires that the counties revise the plan every 10 years. In order to secure DEP approval, the plan must provide for county-wide solid waste management and must ensure at least 10 years of available disposal capacity. The plan also designates those waste disposal facilities that are permitted by DEP under the Solid Waste Management Act (SWMA),[2] to receive municipal solid waste generated within the county.

In order to fulfill its obligations of securing disposal capacity, the Authority previously entered into contracts known as "Disposal Service Agreements" with privately-owned landfills. These Agreements obligate the landfill to accept a specified amount of solid waste generated in the County each year. The prior Disposal Service Agreements set the maximum price for the "tipping fee" that the landfill may charge the waste haulers. The "tipping fee" includes state-mandated fees set forth in Act 101 and other solid waste laws. The "tipping fee" may vary depending on the hauler, the time of year, market conditions, the volume of waste a particular hauler regularly delivers to the facility, the payment history of the hauler and whether or not the hauler pre-pays the "tipping fee."

The County's first Act 101 Plan was adopted in 1991, and it was revised in 1998. Pursuant to that Plan, the Disposal Service Agreements included a $7 per ton administrative fee to be collected by the landfill from waste haulers. The landfill then passed this cost on to the generator of the waste through customer billing.

In 2004, when revising the 1998 Plan, the Authority entered into Disposal Service Agreements with six landfills to provide for disposal capacity for County-generated waste through 2014. The Disposal Service Agreements negotiated in 2004 continued the requirement that the landfill remit the $7 per ton administrative fee for waste "tipped" at the facility. The administrative fee generated approximately $1 million dollars of revenue annually for the Authority. However, although the 2004 Act 101 Plan was approved by the County and submitted to DEP, it was never approved by DEP.

In 2010, DEP notified the Authority that it had not undertaken a "full and complete" 10 year revision of its Plan since 1998. DEP further warned that the administrative fees imposed on the disposal of County waste "may be preempted by Act 101." Reproduced Record (R.R.) at

---

**2.** Act of July 7, 1980, P.L. 380, *as amended,* 35 P.S. §§ 6018.101–6018.1003.

244a. This is the genesis of the current controversy.

After the Authority appealed the letter to the Environmental Hearing Board, it entered into an agreement with DEP which extended the 1998 Plan through 2014 and required the Authority to submit a plan revision by June 30, 2013.

## II. 2012 Requests for Proposals

Accordingly, in May 2012 the Authority issued a nationwide Request for Proposals (RFP) seeking bids from waste disposal facilities with sufficient capacity to accept all or part of County waste generated between the years 2015 and 2025. The Authority determined that the prior method of assuring disposal capacity was no longer adequate, that the Disposal Service Agreements did not guarantee disposal capacity, and that the Agreements did not make provisions for disposal capacity at competitive rates. It concluded that it would seek to purchase its own landfill capacity or "air space" from the landfills.

In a departure from its previous methods, the Authority proposed to enter into a Standard Purchase Agreement with the landfills in which the facility would sell to the Authority "an irrevocable license (legally an easement), to utilize available and permitted airspace solely for the disposal of Monroe County [municipal solid waste]" and that the Authority (and not the landfill owner) would set the " 'tipping fee' to be charged to the waste haulers for the use of the Authority's reserved space the same as if the Authority administered its own disposal facility." Appellee's Br. at 12.

The Authority's "tipping fee" would have three components: 1) the cost of the purchased air space; 2) the operating costs of the landfill; and, 3) the costs of the operation of the Authority's Integrated Waste Management System. The third part of the "tipping fee" would be used to pay the Authority's debt service related to the capital costs of the Authority's facilities and the remaining debt from a failed incinerator project.[3] These funds were previously generated from the Authority's $7 per ton administrative fee, but the legality of the fee was put in question by the DEP letter.

The RFP also provides that the Authority retains the right to use, sell or sell back any unused air space it purchased that remains at the end of the contract term, to the facility itself or "to another generator of municipal waste." R.R. at 21a, 35a. Finally, the RFP requires qualified waste disposal facilities to execute a "Standard Purchase Agreement," by which the Authority will obtain a property interest to use designated air space at the facility. Only those facilities executing the Standard Purchase Agreement will be listed as a Designated Facility in the revised Plan, and only Designated Facilities will be permitted to accept County-generated municipal waste.

The Pennsylvania Waste Industries Association (Appellant) is a trade association of private landfill owners and operators and waste haulers doing business in Pennsylvania. In August 2012, Appellant commenced this action for declaratory judgment against the Authority. It challenged the Authority's power to set the "tipping fee" for waste disposal at privately owned facilities and to include in the "tipping fee"

---

**3.** Under its original plan, a municipal waste disposal facility was to be developed and constructed which would incinerate municipal solid waste generated in Monroe County. To finance the significant costs of the project, the county issued revenue bonds. However, in 1993, after "strenuous objections from the private waste disposal industry and legal and environmental concerns, the County determined that the project was no longer viable." Appellee's Br. at 2.

the costs of its Integrated Waste Management System and debt service. It argued setting the "tipping fee" and including a non-disposal component was *ultra vires* the Authority's enabling legislation and was preempted by Act 101 and related solid waste laws. Appellant also challenged the Authority's current administrative fee on the same grounds.

At trial, the parties agreed to address only the issues related to the RFP, and they reserved the issue of the legality of the current administrative fee for a later time. The trial court issued an order denying Appellant's challenge to the Authority's proposed "tipping fee." The trial court opined that:

> Here, the Authority seeks guaranteed space to dispose of municipal solid waste, and to charge reasonable fees to cover its expenses, by soliciting an RFP to acquire airspace. The Authority wants to acquire certain rights to land, by purchasing airspace above the land, at a waste disposal facility. The proposed RFP states the Authority would retain rights to the air space, which could presumably be sold back to the facility if not used. This Court finds that the purchase of the airspace is an interest in land that the Authority seeks to acquire, under [the Authorities Act] 53 Pa.C.S.A. [sic] § 5607(a)(7), 5607(d)(4) and 5615(a).
>
> The Authority also seeks to enter into contracts to conduct its business, which the [Authorities] Act allows. *See* 53 Pa. C.S.A. [sic] § 5607(d)(13). Finally, the fees charged are for covering expenses allowed by the [Authorities] Act. *See* 53 Pa.C.S.A. [sic] [§ ] 5607(d)(9). . . .

Tr. Ct., Slip Op., 1/11/13, at 4.

The trial court distinguished two cases relied upon by Appellant, *IESI PA Bethlehem Landfill Corp. v. County of Lehigh,* 887 A.2d 1289 (Pa.Cmwlth.2005) (*County of Lehigh* ) and *Pennsylvania Independent Waste Haulers Ass'n. v. County of Northumberland,* 885 A.2d 1106 (Pa.Cmwlth. 2005) (*County of Northumberland* ). Both cases held that municipal charges added to "tipping fees" were preempted by Act 101. The trial court determined both cases were confined to recycling fees under Act 101. Further, the trial court found that the contested fees did not include recycling fees, expressly accepting the Authority's evidence on the issue. As a result, those cases did not preclude the fees at issue here, and Act 101 did not preempt the fees.

Appellant also argued that the administrative fee caused the Authority to compete with private landfills, contrary to the limits on such competition in Section 5607(b)(2) of the Authorities Act, 53 Pa. C.S. § 5607(b)(2). The trial court dismissed this assertion, finding the Authority's evidence of burden and interference unconvincing.

## III. Issues

Appellant timely appealed to this Court.[4] As to questions of law, our standard of review is *de novo,* and our scope of review is plenary. *Middletown Twp. v. Cnty. of Delaware Uniform Constr. Code Bd. of Appeal,* 42 A.3d 1196 (Pa.Cmwlth.2012). As to issues of fact, we defer to the factual findings of the trial court. *Recreation Land Corp. v. Hartzfeld,* 947 A.2d 771, 774 (Pa.Super.2008); *see also Swift v. Dep't of Transp.,* 937 A.2d 1162, 1167 n. 5 (Pa. Cmwlth.2007).

Appellant raises two principle arguments. First, it contends that the Authority's "tipping fee," as proposed in the RFP,

---

4. The County Commissioners Association of Pennsylvania and the Pennsylvania Municipal Authorities Association filed briefs as *amici curiae,* in support of the Authority.

is *ultra vires* the Authority's enabling legislation. In other words, the Authority is not empowered under either the Authorities Act or Act 101 to set "tipping fees" at facilities it does not own or operate.

Second, Appellant asserts that the Authority's "tipping fee," as proposed in the RFP, is preempted by Act 101 and related solid waste laws. Allowing municipalities to impose their own local fees undermines a uniform system of standardized fees, applications and grants.

## IV. Discussion

### A. Authority for Setting Fees

#### 1. Contentions

##### a. Appellant

Appellant contends that the Authority has only such powers and authority as provided by its enabling legislation, specifically, the Authorities Act, and that statute only gives the Authority the power to set rates or charges at waste disposal facilities where it has an actual ownership interest or operational responsibility. Currently, the Authority has a contractual right to use these private landfills as set forth in the Disposal Service Agreements.

Appellant asserts that the Authority is creatively trying to get around the limitations in Section 5607(d)(9) of the Authorities Act, 53 Pa.C.S. § 5607(d)(9), by proposing to purchase a real estate interest in the waste disposal facility through the RFP, in which it will purchase air space and allow it to set the "tipping fees" as an "owner" of that facility. Appellant acknowledges that the Authority characterizes the proposal in the RFP as contemplating the landfills selling the Authority an irrevocable license (legally an easement), to utilize available and permitted airspace solely for the disposal of the County's municipal solid waste; nevertheless, Appellant asserts that there is a legal distinction between a "license" and an "easement" and that the Authority's own witness contradicted this assertion.

Specifically, according to Appellant, under the new contracts, called "Standard Purchase Agreements," the Authority will not be "purchasing" air space or any real estate interest in the facility; rather, it will be obtaining a "license to use" such air space. R.R. 59a, 62a, 99a, 778a–780a, 854a. Appellant argues that a "license to use air space" is simply the authority to do a particular act or series of acts upon another's lands without possessing any real estate therein, and finally that a license is generally revocable. Thus, the Authority's proposed interest is only a contractual right of use, not an interest in land that rises to the dignity of ownership.

Moreover, Appellant disagrees with the trial court's determination that the Authority's proposed purchase of air space involves an interest in real property under the Authorities Act. Appellant contends that an easement is an interest in land owned by another person, consisting of a right to use or control land, or area above or below it, for a specific limited purpose, an easement is generally created and recorded by deed. Once granted, it is not revocable by the grantor. Here, however, the terms of the proposed Standard Purchase Agreements in the RFP are consistent with the granting of a lesser interest, a "license."

Appellant argues that what the Authority is trying to do is read the Authorities Act to allow it to set the rates and charges for waste disposal services it does not provide, at facilities it does not own or operate, in order to recover expenses unrelated to those facilities.

In a related argument, Appellant contends that under the proposed RFP, the Authority will be directly competing with

private waste disposal facilities in contravention of the Authorities Act, and of Act 101. First, Appellant asserts that the "commodity" the private landfill "sells" is space. Appellant's Br. at 20. Therefore, if the Authority is allowed to buy "airspace" which it can then resell to another generator of waste, it is directly competing with the disposal facilities for the business of selling available disposal space.

Second, the Authority operates a transfer station for recyclables. Its customers are commercial businesses, educational institutions and residential communities that are provided recycling containers, which the Authority then collects and hauls to the transfer station for subsequent sale. The Authority also accepts recyclable materials from neighboring counties as well as commercial haulers. The Authority does not charge a fee for dropping off recyclables. However, Appellant's members provide these same services in and around the County. Therefore, the Authority competes commercially with these privately owned enterprises.

Finally, Appellant asserts that under the prior Disposal Service Agreements, the facilities had the ability to set the "tipping fee" and would raise it or lower it depending upon a number of factors, including giving a lower rate or discount to high-volume haulers, for example. Now, however, because the "tipping fee" is set by the Authority, private facilities have no power to lower it on a case by case basis in order to remain competitive.

### b. Authority

In contrast, the Authority argues that nothing it has done or proposed to do is *ultra vires* the Authorities Act or Act 101. The Authority asserts that one of the stated purposes of Act 101 is to allow it to acquire, hold, construct, finance, improve, maintain and operate, own or lease, "pro-

jects of the following kind ... [f]acilities and equipment for the collection, removal or disposal or ashes, garbage, rubbish and other refuse materials by incineration, landfill or other methods." Section 5607(a)(7) of the Authorities Act, 53 Pa. C.S. § 5607(a)(7).

Empowered by Sections 5607(d) and 5615(a)(1) of the Authorities Act, 53 Pa. C.S. §§ 5607(d), 5615(a)(1), the Authority may exercise all powers necessary or convenient for the carrying out of the purposes set forth in this section, including the ability to acquire land or interest in land, such as an easement. The Authority "chose to actually purchase disposal capacity of airspace to be reserved for its use by way of an irrevocable license to use the capacity solely for Monroe County [municipal solid waste]." Appellee's Br. at 15.

The Authority argues that an irrevocable license is an easement and therefore a property right, citing for support *Morning Call, Inc. v. Bell Atlantic–Pennsylvania*, 761 A.2d 139, 144 n. 10 (Pa.Super.2000) (noting that it is expected that irrevocable licenses will no longer be listed among the servitudes because there is little difference between irrevocable licenses and easements). The Authority also relies on Section 1.2(4) of the Restatement (Third) of Property (Servitudes). That Section states in part that, "[a]s used in this Restatement, the term 'easement' includes an irrevocable license to enter and use land in the possession of another...." RESTATEMENT (THIRD) OF PROPERTY (SERVITUDES) § 1.2(4) (2000).

In addressing Appellant's argument that the Standard Purchase Agreement creates only a contractual right to use property and not a property right itself because property rights are created and recorded by deed, the Authority asserts that the property in question herein is "airspace to be filled with processed [municipal solid

waste], [therefore] such a property right is not amenable to a traditional transfer by deed of a fee interest with right of possession, but rather by irrevocable license/easement created by contractual agreement." Appellee's Br. at 19. As the Authority explains it, "[t]his concept meets the needs of the Authority and the disposal facility by guaranteeing the disposal capacity without actually purchasing a portion of a landfill." *Id.*

With respect to its justification for the "tipping fee," the Authority contends that it is not relying on Act 101 or any delegation of authority under Act 101 to justify the proposed "tipping fee." The Authority argues that it is instead relying on relevant provisions in the Authorities Act to operate a waste management system and charge fees accordingly for the use of that system. In particular, the Authority points to Section 5607(d)(9) of the Authorities Act, 53 Pa.C.S. § 5607(d)(9), which it contends, authorizes the charging of the fees necessary to finance its Integrated Waste Management System.

As to the Authorities Act non-competition clause, the Authority makes legal and factual arguments. First, it argues that clause does not apply to a municipal authority that is engaged in the "collecting, removal or disposal of" municipal solid waste. *See* 53 Pa.C.S. § 5607(b)(2)(i). Second, the Authority contends that 100% of County municipal waste is collected, transported and disposed of by private waste haulers. Thus, there is no municipal waste collection provided in the County at all. Therefore, there is no impermissible competition between itself and any private commercial enterprise. While it does provide a voluntary recycling drop-off program in "non-mandated municipalities" and transports the recycled material to its own resource recovery facility, that facility does not duplicate or compete with any existing facility providing similar services because there is no such facility within the County or within a reasonable distance. Appellee's Br. at 21.

### 2. Reasoning

Act 101 does not address the types of charges the Authority seeks to impose here. Accordingly, the Authority does not rely on Act 101; rather, it relies on the Authorities Act.

The parties disagree on whether the Authorities Act allows imposition of the fees. Section 5607(d)(9) of the Authorities Act, pertaining to "Powers," is the applicable provision. It provides in pertinent part, with clause numbers and emphasis added:

> (9) [1] *To* fix, alter, *charge and collect rates and other charges in the area served by its facilities* at reasonable and uniform rates to be determined exclusively by it *for the purpose of providing for the payment of the expenses of the authority, the construction, improvement, repair, maintenance and operation of its facilities and properties* and [2] *in the case of an authority created for the purpose of* making business improvements or *providing administrative services, a charge for such services* which is to be based on actual benefits and which may be measured on, among other things, gross sales or gross or net profits, *the payment of the principal of and interest on its obligations and to fulfill the terms and provisions of any agreements made* with the purchasers or holders of any such obligations, or *with a municipality* and to determine by itself exclusively the services and improvements required to provide adequate, safe and reasonable service, including extensions thereof, in the areas served.

53 Pa.C.S. § 5607(d)(9). This sentence requires significant parsing.

By its terms, the first clause relates to an authority which seeks to charge for the use of "its facilities." The phrase "its facilities" is not defined. In context, the second clause pertains to other authorities which may not have facilities but which provide other functions, such as making business improvements or providing administrative services.

### a. First Clause of Section 5607(d)(9) of the Authorities Act

■ For several reasons, we agree with Appellant that the first clause does not empower the Authority to set "tipping fees" at landfills it neither owns nor operates. Under a common usage construction, and in the context of the entire provision, the phrase "its facilities" refers to some meaningful ownership or operational interest.

There is no dispute that Authority does not and will not participate in operating the private landfills that accept County municipal waste. The focus of the disagreement is whether Authority will acquire a sufficient ownership interest through its proposed Standard Purchase Agreement. In this regard, the parties argue at length about whether the proposed Agreement creates an easement or a license. This argument misses the mark.

Like others who have considered whether the purchase of capacity at a landfill creates a *bona fide* interest in land, we are skeptical that what is primarily a service agreement can be transformed into a purchase of an easement by legal gymnastics. *Cf. Borough of Princeton v. Bd. of Chosen Freeholders of Cnty. of Mercer*, 169 N.J. 135, 777 A.2d 19 (2001) (contracts with landfill for disposal capacity did not qualify as purchase of property rights so as to avoid public bidding statute). However, we need not dispose of this case on that basis.

We need not fully declare the contours of a meaningful ownership interest. Rather, it is sufficient to recognize that neither an easement nor a license is an interest in land of sufficient quality to satisfy the "its facilities" restriction in the first clause. This is in part because neither an easement nor a license is an estate in land. RESTATEMENT (FIRST) OF PROPERTY § 9 (1936). More specifically, an estate signifies an interest in land which is or may become possessory. *Id.* Neither an easement nor a license satisfies that requirement. RESTATEMENT (FIRST) OF PROPERTY § 9 cmt. b (1936); RESTATEMENT (THIRD) OF PROPERTY (SERVITUDES) § 1.2 (2000) (defining easement as a non-possessory right); *see also* RESTATEMENT (FIRST) OF PROPERTY § 512(c) (1944) (in part defining licenses as "not incident to an estate in the land"). Moreover, neither an easement nor a license qualifies as real property; instead, each constitutes personal property. *See* RESTATEMENT (FIRST) OF PROPERTY § 8 cmts. a, c (1936) (only freehold estates are designated as "real property;" lesser interests designated as "personal property"); *In re Incorporation of Borough of Treasure Lake*, 999 A.2d 644, 651 (Pa.Cmwlth.2010) (citing *Townsend v. Boyd*, 217 Pa. 386, 66 A. 1099 (1907); LADNER PENNSYLVANIA REAL ESTATE LAW, § 2.05a (Bisel, 5th ed. 2006)). Finally, in common usage, a person with only one interest in land, such as the Authority's proposed nonpossessory easement or license here, is not usually referred to as the "owner" of the interest; rather, he is referred to as "having" the interest. RESTATEMENT (FIRST) OF PROPERTY § 10 cmt. a (1936) (defining "owner").

For all these reasons, we conclude that regardless of whether the Standard Purchase Agreement creates an easement or a license, that interest does not satisfy the "its facilities" restriction in the first

clause.[5]  Therefore, the Authority is not authorized to set the "tipping fee" at facilities in which it does not have a meaningful ownership or operational interest, and the trial court erred to the extent it concluded otherwise.

### b.  Second Clause of Section 5607(d)(9) of the Authorities Act

■  However, our conclusion with regard to the first clause does not end our inquiry.  The Authority also points to the second clause as a source of statutory authority for imposing fees.  Appellant does not address this clause.

By its terms, the second clause pertains to an authority which may not own or operate "its facilities," but nevertheless provides other functions, such as making business improvements or providing administrative services.  The Authority here qualifies as such.

In its current form, the Authority's purpose is "carrying out the responsibilities conveyed to the Authority by the Monroe County Board of Commissioners to *implement and administer* the Monroe County Solid Waste Management Plan pursuant to [Act 101].  To accomplish these responsibilities, the Authority may employ any and all powers of a Municipal Authority established by Section 4 of the [Authorities Act]."  R.R. at 201a (emphasis added).  Thus, the Authority is expressly tasked with providing administrative services.  In doing so, it may use all the powers available under the Authorities Act.

Moreover, this delegation of Act 101 duties to the Authority is consistent with Act 101.  *See* Sections 103, 303(d) of Act 101, 53 P.S. §§ 4000.103 (definition of "person"), 4000.303(d) (delegation of county responsibility).

As a consequence, the second clause authorizes the Authority "[t]o . . . charge for [administrative] services," including "the payment of the principal and interest on its obligations. . . ."  Section 5607(d)(9) of the Authorities Act, 53 Pa.C.S. § 5607(d)(9).  Thus, the Authority is authorized by statute to impose an administrative charge similar to the $7 per ton charge previously incorporated into its Disposal Service Agreements, subject to other limitations in the second clause that have not been put at issue.

### c.  Competition and Section 5607(b)(2) of the Authorities Act

■  We also reject Appellant's arguments that the limitation in Section 5607(b)(2) of the Authorities Act, 53 Pa. C.S. § 5607(b)(2), prevents the Authority from performing and charging for some of the services it provides as part of the Integrated Waste Management System.

Initially, the Authority argues that the limitation on competing with an existing commercial enterprise serving the same

---

5.  We are also concerned that by setting "tipping fees" at landfills it does not own or operate, which are located in another county and outside its service area, the Authority's actions may be inconsistent with limitations in both clauses of Section 5607(d)(9) of the Authorities Act, 53 Pa.C.S. § 5607(d)(9) (limiting powers to "the areas served"), and with an express purpose set forth in Section 102(16) of Act 101, 53 P.S. § 4000.102(16) (operators of landfills shall give first priority to the disposal of waste generated within the host county).  *Compare* Sections 1975 and 2393 of The County Code, Act of August 9, 1955, P.L. 323, 16 P.S. §§ 1975, 2396 (county may acquire property in county for erection and maintenance of waste disposal facilities; county may charge and receive fees for disposal of garbage in facilities erected and maintained by county); Sections 2175 and 2193 of the Second Class County Code, Act of July 28, 1953, P.L. 723, 16 P.S. §§ 5175, 5193 (same).  Because these issues have not been addressed by the parties, we will not decide this case of the basis of these possible inconsistencies.

purpose does not apply to a municipal authority engaged in the collecting, removal or disposal of municipal waste, citing Section 5607(b)(2)(i) of the Authorities Act, 53 Pa.C.S. § 5607(b)(2)(i).[6] The carve-out from the competition limitation, however, is premised on several conditions, and it is unclear whether the Authority satisfied them.

Nevertheless, the trial court rejected Appellant's competition arguments saying, "However, this Court was not convinced by the testimony presented that the RFP would cause the Authority to unnecessarily burden or interfere with existing business as set forth in 5607(b)(2) [of the Authorities Act]." Tr. Ct., Slip Op., at 8. We are bound by these weight and credibility determinations.

Moreover, the primary focus of Appellant's complaints is the anticompetitive effect of the Authority setting the "tipping fee" at private landfills. Since we have ruled that the Authority is not authorized to set that fee, these complaints become moot.

■ Appellant also complains that the Authority competes with private enterprise in its operation of the recycling component of the Integrated Waste Management System. However, the trial court rejected claims that Authority fees were used to fund recycling programs. Instead, the trial court found credible the Authority's evidence that it will separate recycling costs from solid waste costs, and it will only utilize the recycling funding stream authorized by Act 101. Tr. Ct., Slip Op., at 6. Moreover, the trial court did not make findings that support Appellant's claims of competition in the recycling programs. Given the trial court's findings and non-findings, and given the discussion below regarding preemption, we discern no basis for disturbing the trial court's resolution of this issue.[7]

6. Section 5607(b)(2) of the Authorities Act, 53 Pa.C.S. § 5607(b)(2), provides in pertinent part:

This limitation shall not apply to the exercise of the powers granted under this section:

(i) for facilities and equipment for the collection, removal or disposal of ashes, garbage, rubbish and other refuse materials by incineration, landfill or other methods if each municipality organizing or intending to use the facilities of an authority having such powers shall declare by resolution or ordinance that it is desirable for the health and safety of the people of such municipality that it use the facilities of the authority and state if any contract between such municipality and any other person, firm or corporation for the collection, removal or disposal of ashes, garbage, rubbish and other refuse material has by its terms expired or is terminable at the option of the municipality or will expire within six months from the date such ordinance becomes effective....

7. In a footnote, Appellant also argues that the Authority is not authorized by Act 101 to engage in commercial recycling and deer disposal activities. Appellant's Br. at 14, n.9. Although a footnote is not sufficient to preserve this argument, we disagree on the merits.

First, regardless of Act 101, the Authorities Act grants a municipal authority broad powers, "[t]o do all acts and things necessary or convenient for the promotion of its business...." Section 5607(d)(17) of the Authorities Act, 53 Pa.C.S. § 5607(d)(17).

Second, Act 101 permits a county or its delegee to adopt regulations and standards which are not inconsistent with the provisions and purposes of Act 101 and the SWMA. *See* Sections 303(c), (d) of Act 101, 53 P.S. § 4000.303(c), (d). The express purposes of Act 101 include encouraging the development of waste reduction and recycling, and protecting the public health, safety and welfare. Sections 102(b)(2), (3), 53 P.S. §§ 4000.102(b)(2), (3). Because the complained-of activities are clearly consistent with the stated purposes of Act 101, this aspect of Appellant's *ultra vires* challenge lacks merit.

## B. Preemption by Act 101

### 1. Contentions

#### a. Appellant

Appellant asserts that its preemption argument is limited to whether Act 101 and related solid waste laws preempt the Integrated Waste Management System component of the "tipping fee" proposed by the Authority in its RFP. Appellant argues that it is irrelevant whether the revenue raised from the "tipping fee" funds programs that benefit or regulate the solid waste industry, because the only relevant issue is whether the fee itself is preempted under Act 101 and related solid waste laws. Appellant argues that the General Assembly has evidenced a clear intention to preclude local fees on the solid waste industry, by specifically delineating certain fees that may be imposed on the industry, including precise amounts and the form and timing of the payment, collection, and enforcement.

First, in Act 101, a fee of $1 per ton is authorized payable to municipalities that host waste disposal facilities. Section 1301 of Act 101, 53 P.S. § 4000.1301. Act 101 also levies a $2 per ton "recycling fee" on all solid waste disposed of in Pennsylvania. Section 701 of Act 101, 53 P.S. § 4000.701. This fee is allocated to the Recycling Fund which is then used as part of an elaborate fee-and-grant system to reimburse municipalities for recycling programs, salaries and expenses of recycling coordinators, a majority of the costs of preparing the municipality's waste management plan, pollution prevention education programs and household waste collection programs.

In addition, there are disposal fees imposed on operators of municipal waste landfills by Section 6112 of the Environmental Stewardship and Watershed Protection Act, 27 Pa.C.S. § 6112 (an amount equal to 25 cents per ton of weighted waste or 25 cents per three cubic yards of volume-measured waste for all solid waste received at the landfill), and by Section 6301 of Act 90 of 2002 (Act 90), 27 Pa.C.S. § 6301 (a disposal fee of $4 per ton for all solid waste disposed of at the municipal waste landfill). Appellant asserts that because Act 101 and related solid waste laws clearly contemplate that their fees are the only fees to be imposed on the solid waste industry, the Authority's "tipping fees" are preempted.

Moreover, Appellant contends that the Authority's current administrative fee of $7 per ton funds the County's Integrated Waste Management System. The third component of the "tipping fee" proposed by the Authority in the RFP will fund these services in the future. The system includes recycling programs and drop-off locations, litter control and cleanup programs, community involvement events, school education programs, composting education, household electronic waste drop-off, as well as debt obligations of the failed incinerator project and a cancelled recycling baling project. Appellant contends that under the holding of the *County of Lehigh* case, counties are preempted from funding their own programs outside the scope of Act 101 or Act 90. Appellant argues that this Court in *County of Lehigh* did not limit itself to the issue of recycling fees, "but rather held that the county was not permitted to collect an administrative fee to raise revenue." Appellant's Br. at 36.

#### b. Authority

In response, the Authority argues that the only fee that both Act 101 and that this Court agree have been preempted are fees for recycling programs. *See County of Lehigh; County of Northumberland.*

The Authority argues that by choosing this method of securing guaranteed dispos-

al capacity by way of an irrevocable license to use the airspace for its municipal waste, it has filled a "gap in availability of certain services by developing a facility that serves both public and private needs, [which means] there are additional administrative obligations and costs...." Authority's Br. at 27. Since the Authority has been separating the costs of recycling programs from the rest of their Integrated Waste Management System service costs since 2005, and will continue to do so, the Authority contends that its proposed "tipping fee" is not preempted by Act 101, nor is it precluded by the earlier rulings of this Court.

### 2. Reasoning

■ For the following reasons, we agree with the trial court that the fee preemption by Act 101 is limited to unauthorized recycling fees. We also agree that our decisions in *County of Lehigh* and *County of Northumberland* are limited to unauthorized recycling fees. Accordingly, we affirm the trial court on preemption issues.

■ The three forms of preemption in Pennsylvania are express preemption, based on express statutory declarations, field preemption, where the statute is silent on preemption but pervasively regulates a field, and conflict preemption, where a local regulation is inconsistent with a state statute. *See Nutter v. Dougherty*, 595 Pa. 340, 357, 938 A.2d 401, 411 (2007). Appellant does not specify what form of preemption applies here. Based on its argument, we surmise that Appellant relies on field preemption. *See* Appellant's Br. at 39, n.18.

We recently analyzed the type of preemption arising from Act 101 in *City of Reading v. Iezzi*, 78 A.3d 1257 (Pa. Cmwlth.2013), (*City of Reading*). There a

unanimous panel held, with emphasis added:

In furtherance of its duties, a municipality may adopt an ordinance 'for the recycling, transportation, storage and collection of municipal wastes or source-separated recyclable materials, which shall not be less stringent than, and not in violation of or inconsistent with, the provisions and purposes of [SWMA], this act and the regulations promulgated pursuant thereto.' Section 304(b) of Act 101, 53 P.S. § 4000.304(b) (emphasis added). *Thus, Act 101 contains an express preemption provision predicated on inconsistency of municipal regulations of municipal waste disposal and state regulation.*

*Id.* at 1264.

Further, in *City of Reading* we confirmed that a municipality's imposition of a service charge which covered all costs of its recycling program was inconsistent with the comprehensive statewide recycling funding provisions in Act 101 and related statutes. *Id.* In doing so we expressly relied upon our decision in *County of Northumberland. Id.* We also held that such a recycling service charge was inconsistent with an express purpose of Act 101. *Id.*

This Court has never held that Act 101 preempts other municipal charges that are otherwise authorized by statute, and we decline to do so now. We base this position on a careful review of provisions of Act 101.

As set forth at some length in *City of Reading* and *County of Northumberland*, recycling is given extensive, special treatment in Act 101. By way of example, two entire chapters, Chapters 7 and 9, are devoted to the recycling fee and grant system. Also, the recycling funding scheme is the subject of express Legislative findings and purposes. *See* Sections

102(a)(9), 102(b)(6) of Act 101, 53 P.S. §§ 4000.102(a)(9), 4000.102(b)(6). Clearly, fees which are the subject of such extensive regulation deserve careful review by courts for conformity with Act 101.

However, there are indications that the Legislature intended that other municipal action may be tolerated if not inconsistent with the provisions and purposes of Act 101. Thus, the express preemption language of Act 101 does *not* contemplate field preemption. *See* Sections 303(c), (d), 304(b)(1) of Act 101, 53 P.S. §§ 4000.303(c), (d) (counties and their delegees), 4000.304(b)(1) (other municipalities). Only inconsistency is contemplated.

Also, the first express purpose of Act 101 is to "[e]stablish and maintain *a cooperative State and local program of* planning and technical and *financial assistance* for comprehensive municipal waste management." Section 102(b)(1) of Act 101, 53 P.S. § 53 P.S. § 4000.102(b)(1) (emphasis added). This language anticipates some local financial assistance. Our Supreme Court held that similar language in former Section 2 of the now-repealed Emergency Medical Service Act[8] supported a conclusion that full preemption was not intended. *Mars Emergency Med. Servs., Inc. v. Twp. of Adams,* 559 Pa. 309, 740 A.2d 193 (1999).

■ More to the point, while Appellant makes a policy-heavy argument that administrative fees would create a crazy-quilt of local fees, upsetting the carefully designed statewide program of standardized fees, the trial court made no findings that would support these arguments. The only relevant findings of the trial court are that recycling fees were not included in the fees the Authority planned to charge. Thus,

the trial court did *not* find that the $7 per ton administrative fee charged by the Authority since 1998 had any negative effect on Appellant's members or on a statewide program of fees. This is not surprising, since the administrative fee was passed through to the waste generators and not borne by Appellant's members.

Furthermore, much of Appellant's "uniformity" argument is focused on the statewide recycling fee and grant system. We agree that the funding system for recycling must be uniform in order to attain the required efficiency. *City of Reading.* That is why this Court holds that unauthorized local fees which cover recycling are preempted by Act 101. *Id.; Cnty. of Northumberland.* There are other fees given special treatment in Act 101, and we may need to consider preemption with regard to those fees in the future. *See, e.g.,* Sections 102(b)(7), (8) of Act 101, 53 P.S. §§ 4000.102(b)(7) (host municipality benefit fee), 4000.102(b)(8) (site specific postclosure fee). However, the administrative fee with which we are currently dealing is not one of the fees specifically addressed by Act 101.

Considering the foregoing, we must conclude that Appellant has failed to prove that a statutorily-authorized administrative fee which does not cover recycling programs is inconsistent with Act 101.

We specifically reject Appellant's argument based on language in our *County of Lehigh* decision. In *County of Lehigh* this Court held that a county's administrative fee on waste haulers was preempted by Act 101. In *County of Lehigh,* this Court expressly relied on our recent decision in *County of Northumberland,* in which we held that local recycling fees were preempted by Act 101. Appellant asserts

**8.** Act of July 3, 1985, P.L. 164, *as amended, formerly* 35 P.S. § 6922, *repealed by* the Act of August 18, 2009, P.L. 308.

that these cases stand for the proposition that all local fees are preempted by Act 101.

There are two important reasons why Appellant's argument based on *County of Lehigh* fails. First, the fee at issue in *County of Lehigh* covered costs of the county recycling program. *Cnty. of Lehigh*, 887 A.2d at 1292. Here, the challenged fee was found *not* to include costs of the county-wide recycling program.

Second, and of more consequence, the local fee at issue in *County of Lehigh* was not authorized by any statute. In contrast, the Authority here is permitted by the Authorities Act to charge for its administrative services.

We also reject Appellant's arguments based on this Court's decision in *Northern Tier Solid Waste Authority v. Department of Revenue*, 860 A.2d 1173, 1181 (Pa. Cmwlth.2004). Appellant cites the case as support for the claim that "the Legislature intend[ed] to create an all-embracing 'uniform system of municipal waste fee imposition' on the solid waste industry." Appellant's Br. at 26.

There are two reasons why *Northern Tier* does not assist in the resolution of the current controversy. First, the question in *Northern Tier* was the meaning of the term "operator," on whom a fee was imposed, where the most recent statute in a series did not define that term. The question now is somewhat different: who can impose a fee? Second, *Northern Tier* did not involve an issue of preemption. Therefore, language in that case was not intended to address preemption.

## V. Conclusion

In sum, we hold that the Authority is not authorized by the first clause of Section 5607(d)(9) of the Authorities Act to set the "tipping fee" at landfills in which it does not have a meaningful ownership or operational interest. However, the Authority is authorized by the second clause of Section 5607(d)(9) of the Authorities Act to charge for its administrative services, including debt service.

Further, Act 101 preempts local fees covering recycling programs. However, Act 101 does not preempt other local fees which are otherwise permitted by statute and which are not inconsistent with Act 101's provisions and purposes.

For all these reasons, we reverse the trial court only to the extent of the Authority's proposed setting of "tipping fees" at private landfills. Otherwise, the trial court is affirmed.

### ORDER

**AND NOW,** this 21st day of November, 2013, the order of the Court of Common Pleas of Monroe County in the above-captioned matter is **AFFIRMED in part and REVERSED in part,** in accordance with the foregoing opinion.

The case is **REMANDED** to the Court of Common Pleas of Monroe County for further proceedings. Jurisdiction is relinquished.