**WASTE MANAGEMENT OF PENNSYLVANIA, INC., Evergreen Landfill, Inc., Laurel Highlands Landfill, Inc., Southern Alleghenies Landfill, Inc., Shade Landfill, Inc., and Waste Management Disposal Services of Pennsylvania, Inc., Petitioners**

v.

**COMMONWEALTH of Pennsylvania, DEPARTMENT OF ENVIRONMENTAL PROTECTION, and Clearfield County, Respondents.**

Commonwealth Court of Pennsylvania.

Argued Dec. 10, 2014.

Decided Jan. 8, 2015.

John K. Gisleson, Pittsburgh, for petitioners.

Paul J. Bruder, Jr., and Alicia R. Duke, Harrisburg, for respondent Clearfield County.

Amy F. Ershler, Assistant Counsel, Williamsport, for respondent Department of Environmental Protection.

BEFORE: DAN PELLEGRINI, President Judge, and BONNIE BRIGANCE LEADBETTER, Judge, and ROBERT SIMPSON, Judge, and MARY HANNAH LEAVITT, Judge, and PATRICIA A. McCULLOUGH, Judge.

OPINION BY Judge SIMPSON.

In this interlocutory appeal by permission, Waste Management of Pennsylvania, Inc., Evergreen Landfill, Inc., Laurel Highlands Landfill, Inc., Southern Alleghenies Landfill, Inc., Shade Landfill, Inc., and Waste Management Disposal Services of Pennsylvania (collectively, Waste Management) ask whether the Environmental Hearing Board (Board) erred or abused its discretion by denying Waste Management's motion for summary judgment challenging the Department of Environmental Protection's (Department) approval of revisions to Clearfield County's (County) Municipal Solid Waste Management Plan (Plan Revision). Waste Management claims the Revision Plan, which conditioned selection of a disposal facility on financial and programmatic support for the County's recycling programs, is contrary to the Municipal Waste Planning, Recycling and Waste Reduction Act [1] (Act 101) and relevant case law. For the reasons that follow, we affirm.

## I. Background

Act 101 requires each county to adopt and periodically revise a waste management plan for municipal waste and to submit the plan to the Department for approval. In 2010, the County revised its existing Act 101 plan to address a shortfall in financing for its integrated waste management program, which included the County's waste, recycling and ancillary programs such as illegal dumping and

1. Act of July 28, 1988, P.L. 556, *as amended,* 53 P.S. §§ 4000.101–4000.1904.

other non-Act 101 recycling.[2] The Plan Revision described recycling program sustainability challenges facing rural counties, including County. It explained that rural counties, unlike their urban counterparts, have an abundance of open space and fewer municipalities meeting Act 101's population and density criteria for mandatory recycling. These conditions impede the ability of rural counties to provide cost-effective recycling services. Reproduced Record (R.R.) at 546a.

The County created and initially funded its integrated waste management program with State recycling grants and County-imposed administrative fees. *Id.* at 547a. Prior to 2005, approximately 70 percent of the County's financial support for its programs came from administrative fees. *Id.* As a result of 2005 decisional law,[3] the County stopped receiving administrative fees, which created a significant shortfall in funding. *Id.* at 549a. The loss of these funds jeopardized the sustainability of the County's programs. *Id.*

The County commissioned a sustainability study, which presented alternate methods to make up the deficit in recycling funding. The study presented funding options, including negotiating voluntary contributions, seeking sponsorships or in-kind services, implementing user fees, or using County funds. *Id.* at 547a. The County also formed a committee to assist in reviewing the study and revising its plan. *Id.* at 548a. The County ultimately chose to secure funds needed to sustain the

County's programs by developing a request for proposals (RFP) that would not only address waste disposal, but would include how proposals can support the goals of Act 101 and recycling. *Id.* at 549a.

In conjunction with its Plan Revision, the County issued the RFP for "Integrated Municipal Solid Waste Management Services," which included both waste disposal and recycling programs. *Id.* at 118a. To address the funding shortfall and sustain the programs, the RFP solicited proposals that would *"provide tangible financial and/or programmatic support to [the] County's integrated waste management programs."* *Id.* at 120a (emphasis added). The RFP stated:

> Proposals responsive to this need might include provision of services purchased by the [C]ounty in the past or revenue sharing or a mixture of these approaches. Facilities responding are encouraged to develop and propose innovative, cost effective alternatives for meeting this need. Facilities may wish to partner with other providers in making a proposal.

*Id.* The RFP directed that "proposals *shall specify* how the facility offers to support [the] County's integrated waste management services which shall include *qualification and quantification of how the proposal(s) shall address the funding shortfall and/or tangibly augment [the]*

---

**2.** Section 502(e) of Act 101, 53 P.S. § 53.4000.502(e), lists the following materials as recyclable under Act 101: clear glass, colored glass, aluminum, steel and bimetallic cans, high-grade office paper, newsprint, corrugated paper, plastics and leaf waste. Non-Act 101 recyclable materials includes: tires, electronics, household hazardous wastes, motor oil, anti-freeze, mercury thermostats, and fluorescent bulbs. *See* Reproduced Record (R.R.) at 121a.

**3.** In *IESI PA Bethlehem Landfill Corporation v. County of Lehigh*, 887 A.2d 1289 (Pa. Cmwlth.2005), and *Pennsylvania Independent Waste Haulers Association v. County of Northumberland*, 885 A.2d 1106 (Pa.Cmwlth. 2005), this Court held Act 101 prohibits counties from imposing any fees to fund their recycling programs.

*County's programs during the contract period."* *Id.* at 123a (emphasis added).

The County then evaluated each of the responses using point-rated evaluation criteria:

- Ability to reserve capacity in addition to required 50% minimum (10 points)
- Cost per ton for providing disposal capacity and appropriateness of the basis for tipping fee escalation (40 points)
- *Environmental soundness of proposal. Will be based on the proposal responsiveness in relation to supporting the waste reduction hierarchy and the benefits to public health and safety, economic or financial benefits to residents or local government, decreasing the risk of liability from improper disposal of municipal waste, and the relevant purposes and goals of Act 101 (30 points)*
- Proposer's experience, qualifications and compliance record (20 points)

*Id.* at 139a (emphasis added). The maximum number of points any responder could receive was 100 points. *See id.*

The County received bids from eight qualified disposal facilities.[4] Based on the point-rated evaluation criteria, Veolia Greentree Landfill (Veolia) scored the highest with 100 out of 100 points; Wayne Township Landfill (Wayne) scored the second highest with 62 points. *Id.* at 238a, 555a. The other facilities scored less than 47 points. *Id.* at 555a.

Veolia and Wayne were the only facilities that included tangible financial support in the "environmental soundness"

category in their bids. Veolia, which conditioned its proposal on exclusivity, proposed to make cash payments to the County of $140,000 per year for each of the 10 years in the Revision Plan. *Id.* at 361a. It also offered to handle the County's drop-off recycling for only $100 per year, a financial value of $48,000 per year to the County, and provide free tire recycling. *Id.* Wayne proposed to pay the County a $2 per ton voluntary donation. *Id.* at 362a. The Waste Management facilities responded they were willing to negotiate a fee after designation in the Revision Plan. Based on these responses, Veolia scored 30 out of 30 points, and Wayne scored 15 out of 30 points in the environmental soundness category, whereas the Waste Management facilities each received only 5 out of 30 points for their willingness to negotiate a fee. *Id.* at 41a, 361a, 555a.

The County initially awarded the contract exclusively to Veolia, but based on hauler concerns, the County designated Wayne as a second disposal facility. *Id.* at 362a. As it was no longer the exclusive facility, Veolia renegotiated the terms of its proposal, providing for a reduction in drop-off-services costs by $34,000 annually, an annual financial donation of $27,500, as well as free tire recycling collection. *Id.* at 564a; 1386a–88a. The County then entered contracts with both Veolia and Wayne.

In November 2012, the County submitted its Plan Revision to the Department for approval. The Department reviewed the plan pursuant to its 2010 Guidelines

---

4. To qualify, the County required bidders to: provide all required proposal forms; possess a current state issued waste disposal permit and the ability to accept waste as of January 2012; and, guarantee a disposal capacity of at least 50 percent of the County's anticipated municipal solid waste for 10 years. R.R. at

139a. The eight qualified bidders were Veolia Greentree Landfill, Wayne Township Landfill, Evergreen Landfill, Shade Landfill, Northwest Landfill, Mostoller Landfill, Lakeview Landfill, and Laurel Highlands. *Id.* at 555a.

for the Development and Implementation of County Municipal Waste Management Plan Revisions. *See id.* at 67a–87a. Upon finding the Plan Revision met Act 101's requirements, the Department approved it in January 2013. *Id.* at 1278a–81a.

Thereafter, Waste Management, as disappointed bidders, filed an appeal with the Board. The parties engaged in discovery. Asserting there were no material facts in issue, Waste Management filed two motions for summary judgment. In the first motion, Waste Management requested the Board to overturn the Plan Revision, arguing the County solicited a fee for recycling, which is not allowed. In the second motion, Waste Management requested the same relief, claiming the process for designating the disposal facilities was less than fair, open and competitive.

A majority of the five-member Board denied both motions and filed a 20–page opinion in support. Of relevance here is the Board's denial of the motion pertaining to the County's solicitation for voluntary support. The Board majority prefaced its opinion stating its role is limited to reviewing the Department's approval of the Revision Plan. The Department must approve any plan that: (1) is complete, accurate and consistent with Act 101; (2) provides for maximum feasible development and implementation of recycling programs; and, (3) provides for the processing and disposal of municipal waste for at least 10 years. Section 505(b) of Act 101, 52 P.S. § 4000.505(b).

The Board found "[t]he RFP's reference to 'tangible financial and/or programmatic support' meant money or services, while 'quantification' meant the dollar value of the cash contribution or services that the proposer would provide." Bd. Op., 5/5/14, at 3. The Board disagreed with Waste Management's argument that Act 101 preempts a county from *requesting* pay-ments to help cover recycling programs or services. Case law interpreting Act 101 dealt with the *imposition of mandatory administrative fees,* not with *requests* for recycling assistance. It declined to expand the law to preclude requests for voluntary support.

The Board explained the purpose of Act 101 is to "[e]stablish and maintain a cooperative State and local program of planning and technical and financial assistance for comprehensive municipal waste management." *Id.* at 7 (quoting Section 102(b)(1) of Act 101, 53 P.S. § 4000.102(b)(1)) (emphasis omitted). "[T]his language anticipates some local financial assistance." *Id.* (quoting *Pa. Waste Indus. Assoc. v. Monroe Cnty. Mun. Waste Mgmt. Auth.,* 80 A.3d 546, 560 (Pa.Cmwlth.2013)). The Board continued:

A fee is like a tax. It is unilaterally 'imposed' by a government unit. The county comes up with an amount, everyone affected pays it, and it is not negotiable. There is a fundamental difference between a fee or tax imposed by a governmental unit and a request for voluntary assistance. Where a fee or tax is imposed, the statutory authority should be clear. The Court struck down the imposition of fees because they were not expressly authorized in Act 101. · [*Pa. Indep. Waste Haulers Assoc. v. Cnty. of Northumberland,* 885 A.2d 1106, 1111 (Pa.Cmwlth.2005) ]. In other words, if the Legislature had wanted to authorize counties to impose fees or taxes, it would have said so in the statute.

Such express authority is not as critical when a request for voluntary assistance is involved. It is not as important that we search Act 101 for language expressly authorizing requests for assistance. The fact that Act 101 nowhere expressly states that counties may re-

quest assistance does not appear to us to be fatal to [the County]'s innovative approach. In fact, Act 101 expressly requires counties to provide for the 'maximum feasible development and implementation of recycling programs.' 53 P.S. § 4000.505(a)(2). This is exactly what [the County] has done. As noted by the Court in [*Monroe*], Act 101 'anticipates some local financial assistance.' 80 A.3d at 560. Putting these two concepts together, Act 101 anticipates that counties will rely on some local financial assistance to achieve the maximum feasible implementation of recycling programs. We should not be quick to hamstring the [C]ounty so long as its efforts to comply with Act 101 stop short of imposing new taxes or fees.

Bd. Op. at 8.

The Board majority concluded Act 101 is not so pervasive or comprehensive that it precludes coexistence of a request for voluntary assistance. It determined the record does not support Waste Management's characterization of this voluntary request as a mandatory recycling fee. Thus, it denied Waste Management's motion for summary judgment regarding the solicitation of support.

To that end, two members of the Board dissented.[5] The dissenters opined the funding approach of seeking voluntary contributions is not among the express sources of income set forth in Act 101 and is thus preempted.

■ From this decision, Waste Management requested and was granted permission to file an interlocutory appeal.[6] The limited issue on appeal is, "[w]hen seeking to raise revenue for its recycling program, does a county violate the funding provisions of [Act 101] by (a) requesting money and/or services from disposal facilities, (b) conditioning selection of a disposal facility on the facility's 'tangible financial and/or programmatic support', or (c) seeking local financial assistance from disposal facilities." Commonwealth Ct. Order, 8/12/14, at 1–2. This matter presents a question of law regarding the proper interpretation of Act 101.[7]

In addition to the briefs submitted by the parties, the Court received amici curiae briefs from Pennsylvania Waste Industries Association (Amicus PWIA),[8] in support of Waste Management's position, and from the County Commissioners Association of Pennsylvania (Amicus CCAP), joined by Pennsylvania Municipal Authorities Association (Amicus PMAA),[9] in support of the Respondents' position.

---

5. To the extent the majority of the Board denied the second motion regarding the designation process, the dissenting Board members concurred with this result. This portion of the decision is not presently before us for review.

6. This Court granted the petition for permission for the interlocutory appeal pursuant to Pa.R.A.P. 312, 1311. *See* Commonwealth Ct. Order, 8/12/14. This Court has subject matter jurisdiction pursuant to Section 763(a) of the Judicial Code, which provides the Commonwealth Court shall have exclusive jurisdiction of appeals from final orders of the Board, and Section 702(b) of the Judicial Code, which authorizes jurisdiction over interlocutory appeals by permission. 42 Pa.C.S. §§ 763(a), 702(b).

7. Where an appeal presents a question of statutory interpretation of law, our review is plenary. *See Commonwealth v. Kerstetter*, 62 A.3d 1065 (Pa.Cmwlth.2013), *aff'd*, —— Pa. ——, 94 A.3d 991 (2014).

8. Amicus PWIA is a nonprofit trade association representing the interests of the private waste industry in Pennsylvania. Pa. Waste Indus. Assoc.'s Amicus Curiae Br. at 2.

9. Amicus CCAP is a statewide, nonprofit, bipartisan association representing the commissioners, chief clerks, administrators, their

## II. Contentions

Waste Management contends it is entitled to summary judgment where the Department improperly approved the County's Revision Plan, which included a request for financial support to fund its recycling program. Act 101 specifies the funding for municipal recycling programs, and it does not provide any authority to raise revenue by other means. The relevant case law—*Northumberland, IESI PA Bethlehem Landfill Corporation v. County of Lehigh,* 887 A.2d 1289 (Pa. Cmwlth.2005), and *Monroe*—clearly prohibits counties from imposing fees on disposal facilities or waste haulers.

Although the County did not mandate a fee *per se,* it conditioned the selection of a disposal facility on the facility's provision of "tangible financial and/or programmatic support" for the County's recycling programs. Petitioner's Br. at 15; *see* R.R. at 120a. According to Waste Management, the County's request for voluntary support to fund its recycling program is a "vehicle . . . to reimpose the mandatory fees preempted by Act 101." Petitioner's Br. at 29. By this request, the County's Revision Plan raises revenue by other means and improperly circumvents Act 101's preemption of municipal administrative fees to fund recycling.

In addition, Waste Management argues that, although Act 101 may anticipate "local financial assistance" from public sources, it does not contemplate assistance derived from private organizations. *Id.* at 32. A fundamental purpose of Act 101 is to "[e]stablish and maintain a cooperative State and local program of planning and technical and financial assistance for comprehensive municipal waste management."

*Id.* (quoting 53 P.S. § 4000.102(b)(1)). This authorizes financial assistance from public sources, not private industry. The Board erred in concluding otherwise.

Amicus PWIA adds the County merely re-characterized what was formerly a mandated county administrative fee to pay for its recycling program as a "request" for "voluntary" support. Pa. Waste Indus. Assoc.'s Amicus Curiae Br. at 4. The distinction is mere sophistry and undermines Act 101's legislative goals of providing a uniform funding system for recycling programs and making those programs financially self-sufficient. Given the power counties have to deny a bidder designated-facility status, these "requests" for voluntary contributions put bidders in an untenable situation. *Id.* at 7. The reality is a facility that does not "[pay] to play" by offering assistance will not be chosen. *Id.* at 9. Although the request is labeled voluntary, it is naïve to think facilities will not feel compelled to propose some payment in a bid to support the County's recycling program in order to win the bid.

The County responds the Board properly concluded the request for voluntary assistance in the County's RFP was permissible under Act 101. Although prior decisions of this Court concluded mandatory fees imposed by local government entities for recycling are prohibited by Act 101, there is no such prohibition on requests for voluntary contributions. The Board properly interpreted legal precedent and declined to expand those holdings to include voluntary contributions. Furthermore, such requests are consistent with Act 101's goals and its comprehensive plan for waste reduction and recycling programs.

equivalents in home rule counties, and solicitors of Pennsylvania's 67 counties. Cnty. Cmmrs. Assoc. of Pa.'s Amicus Curiae Br. at 2. Amicus PMAA is an association of over 700

municipal authorities as well as 600 associate members who provide services to municipal authorities. Pa. Mun. Auth. Assoc.'s Statement of Joinder at 1.

Moreover, the County defends that its designation process did not render the contribution a mandatory fee. The County considered voluntary contributions and discounted services in the environmental soundness category. This category made up only 30 of 100 possible points in the scoring process. Facilities were not disqualified for not offering assistance or discounts, and if a facility scored higher in other categories, it could have been chosen, without offering any support. In fact, elimination of the environmental soundness category from the scoring process would not have altered Veolia's and Wayne's status as highest scoring facilities based on their scores in the other categories. *See* R.R. at 555a.

The Department asserts it approves plans that, among other criteria, provide for the maximum feasible development and implementation of recycling programs as well as for the processing and disposal of municipal waste in a manner consistent with the Solid Waste Management Act [10] (SWMA). The Department defers to the County's expertise with regard to the process used to procure waste management services, provided it is consistent with the law. Although the law provides the County cannot impose a fee to fund recycling, Act 101 does not prohibit a county from requesting assistance with its recycling program so long as the assistance is "truly voluntary." Dep't of Envtl. Prot.'s Resp't's Br. at 2. Because the issue before the Court does not involve mandatory fees, neither *Northumberland* and *Lehigh* are on point.

Moreover, the Department contends this Court's holdings in *Northumberland* and *Lehigh* should be revisited and reevaluated with full consideration of the limitations of the Recycling Fund. Act 101's grant provisions limit how the funds in the Recycling Fund can be disbursed. An advisory committee makes recommendations on how to disburse funds in the Recycling Fund. Section 706(e) of Act 101, 53 P.S. § 4000.706(e). There is nothing in the record to show how the committee prioritizes funds for disbursement. There is no guarantee a county will receive the funds it needs to sustain its program. Further, not all costs attendant to recycling are covered by Act 101, such as costs for preparing grant applications and salaries.

The Department argues counties cannot be placed in a "catch–22" of being limited from obtaining funds through the Recycling Fund and then precluded from requesting voluntary support from the private sector. Dep't of Envtl. Prot.'s Resp't's Br. at 27. As the Department notes, the more the Commonwealth recycles, the less money is available in the Recycling Fund to go around. The County, by requesting voluntary assistance, recognized the Recycling Fund's limitations and operated within the parameters of Act 101 to sustain its program.

Finally, the Department asserts the County's request for voluntary assistance is not preempted by Act 101. There are three forms of preemption: 1) express preemption, based on expressed statutory declarations; 2) field preemption, where the statute is silent, but there is pervasive legislation in a field; and, 3) conflict preemption, where the local regulation is inconsistent with a state statute. Dep't of Envtl. Prot.'s Resp't's Br. at 20 (citing *Monroe* ). Field preemption is not applicable because counties and municipalities have roles in implementing Act 101's goals and purposes. Conflict preemption also does not apply because Act 101 expressly provides a county may enact ordinances as long as they are not less stringent than

---

**10.** Act of July 7, 1980, P.L. 380, *as amended,*    35 P.S. §§ 6018.101–6018.1003.

Act 101 or the SWMA with respect to handling municipal waste.

The only type of preemption arguably applicable is express preemption, which applies where the statute includes language specifically barring local authorities from action on a particular subject matter. Although this Court interpreted Act 101 as expressly preempting municipalities from imposing their own administrative fee to help fund their recycling programs, as such fees are expressly provided for in the act, Act 101 does not prohibit municipalities from seeking *other* types of support for their programs. In fact, Act 101 provides a flexible and effective means to implement recycling, and it encourages municipalities to use the capabilities of private enterprise wherever feasible. *Id.* at 26–27 (citing 53 P.S. § 4000.102(b)).

In support of the Respondents' positions, Amicus CCAP, joined by Amicus PMAA, adds the right balance of public and private recycling programs will have a much better chance of achieving the goals and purposes of Act 101 with respect to recycling, especially in rural areas of the Commonwealth. Act 101's uniform system is anything but, and the recycling goals of Act 101 are hardly being met as counties struggle to keep their programs afloat with the limited funding afforded by Act 101. As county programs fail due to lack of funding, CCAP advances private recycling operations will indeed step in to provide services, but only in those areas that are easy to reach and are cost efficient to help the company turn a profit. Rural areas will not benefit from this, and recyclable material will end up in the trash and headed to a landfill—a benefit to private industry as greater tonnage amounts to more tipping fees. The only alternative to a request for alternate assistance would be to raise taxes and issue bonds, which would increase the County's debt load.

The RFP's request for support is not inconsistent with the provisions or purposes of Act 101 as it seeks voluntary, not mandatory, support for sustaining its integrated waste management programs.

In reply, Waste Management counters there is no compelling reason for this Court to reevaluate prior decisions. Contrary to the Department's assertions that this Court did not have the opportunity to consider the limitations of the Recycling Fund in deciding *Northumberland,* the Department presented the same public policy concerns in its amicus brief filed in that case. Any disagreement with this Court's determination of legislative intent is not a compelling reason to overturn stare decisis. Rather, the remedy rests in the hands of the legislature or the Pennsylvania Supreme Court. In the nine years since this Court's 2005 opinions, the legislature has not enacted any amendments allowing municipalities to collect fees.

Moreover, with regard to preemption, Waste Management asserts the County's request for financial support to fund recycling is preempted by Act 101. Act 101 implicates "conflict" preemption because Section 303(c) provides " 'a county may adopt ordinances ... for the processing and disposal of municipal waste, which shall not be less stringent than, and not in violation of or inconsistent with, the provisions' of [Act 101.]" Petitioner's Reply Br. at 10 (quoting 53 P.S. § 4000.303(c)). This is "an express preemption provision predicated on inconsistency of municipal regulations of municipal waste disposal and state regulation." *Id.* (quoting *Monroe,* 80 A.3d at 559). The General Assembly intended for municipalities to play a significant role in administering Act 101, and it bestowed on them many powers. However, it expressly limited municipalities' power by prohibiting any local regulation inconsis-

tent with Act 101. Because the General Assembly created the Recycling Fund as the source for funding recycling programs and imposed a $2 per ton fee on disposal facilities to fund the Recycling Fund, any additional funding sought by the counties from disposal facilities is inconsistent with the statutory funding scheme and is preempted.

Waste Management also takes issue with the Department's assessment of the RFP's solicitation for tangible support as "truly voluntary." Petitioner's Reply Br. at 13. It claims the Department merely assumed it was voluntary, but it did not conduct any factual review of voluntariness before approving the Revision Plan. Neither the Department nor the County addressed the practical, real-world effect of a county requesting financial assistance from a disposal facility as part of its bid submission when the facility faces exclusion from a county's Act 101 plan for 10 years if unsuccessful.

### III. Discussion

Summary judgment is appropriate where the record clearly shows there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Dean v. Pa. Dep't of Transp.*, 561 Pa. 503, 751 A.2d 1130 (2000); *Lehigh.* The record must be viewed in the light most favorable to the nonmoving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party. *Dean.*

In Act 101, the General Assembly addressed the municipal waste industry in order to provide a comprehensive program of ensuring adequate planning and implementation of future disposal capacity as well as encouraging more recycling efforts. *Monroe.* The General Assembly declared waste reduction and recycling are preferable to processing or disposal of municipal

waste. Section 102(a)(8) of Act 101, 53 P.S. § 4000.102(a)(8). Among the many enumerated purposes, Act 101 is designed to:

(1) Establish and maintain a cooperative State and local program of planning and technical and financial assistance for comprehensive municipal waste management.

(2) Encourage the development of waste reduction and recycling as a means of managing municipal waste, conserving resources and supplying energy through planning, grants and other incentives.

\* \* \*

(4) Provide a flexible and effective means to implement and enforce the provisions of this act.

(5) Utilize, wherever feasible, the capabilities of private enterprise in accomplishing the desired objectives of an effective, comprehensive solid waste management plan.

(6) Establish a recycling fee for municipal waste landfills and resource recovery facilities to provide grants for recycling, planning and related purposes.

\* \* \* \* \* \*

Section 102(b) of Act 101, 53 P.S. § 4000.102(b). The General Assembly encouraged counties, in carrying out their powers and duties under Act 101, to "[u]tilize to the fullest extent practicable all available facilities and expertise within the scrap processing and recycling industry for processing and marketing recyclable materials from municipal waste." Section 102(a)(23)(ii) of Act 101, 53 P.S. § 4000.102(a)(23)(ii).

Further, the terms and provisions of Act 101 are to be liberally construed, so as to best achieve and effectuate its goals and purposes. Section 104(a) of Act 101, 53 P.S. § 4000.104(a). Act 101 must be construed *in pari materia* with the SWMA.

Section 104(b) of Act 101, 53 P.S. § 4000.104(b).

Of particular import here, Act 101 requires counties to adopt a municipal waste management plan for municipal waste generated within its boundaries. Section 501(a) of Act 101, 53 P.S. § 4000.501(a); *see Monroe.* Counties must revise the plan every 10 years. *See* 53 P.S. § 4000.501(c); Section 502(b) of Act 101, 53 P.S. § 4000.502(b); *Monroe.* All plans and revisions are subject to Department approval. 53 P.S. § 4000.501(a); *see* Section 301 of Act 101, 53 P.S. § 4000.301; *see also Monroe.*

In order to secure Department approval, the plan must provide for county-wide waste management and must ensure at least 10 years of available disposal capacity. 53 P.S. § 4000.502; *see Monroe.* Every plan must describe: the nature of the waste and recyclable materials; the permitted waste disposal facilities; the estimated future capacity; financial factors; and, the location of each municipal waste processing or disposal facility and recycling program. 53 P.S. § 4000.502; *see Monroe.* Plans must not be inconsistent with any provision of Act 101. *See* Section 301(15) of Act 101, 53 P.S. § 4000.301(15).

Two chapters of Act 101 address the General Assembly's plan for funding municipal recycling programs. Specifically, Chapter 7 addresses recycling fees and Chapter 9 addresses grants. In Section 701, the legislature imposes a recycling fee of $2 per ton for all solid waste processed at resource recovery facilities or disposed of at municipal waste landfills, to be paid by the operator of such facilities or landfills where the waste is disposed. 53 P.S. § 4000.701; *see Northumberland.* The fees are then transmitted to the Commonwealth and deposited in a Recycling Fund. Section 706(a) of Act 101, 53 P.S. § 4000.706(a). Moneys placed in the Recycling Fund are appropriated to the Department for allocation as specified in Section 706, including grants to municipalities[11] for the development and implementation of recycling programs, recycling coordinators, market development and waste reduction studies and research. Section 706(b) of Act 101, 53 P.S. § 4000.706(b). At least 70% percent of the moneys received by the Recycling Fund are granted to the municipalities for the development and implementation of recycling programs. 53 P.S. § 4000.706(c)(1).

Section 902 directs the Department to award grants for the development and implementation of municipal recycling programs upon application from any municipality meeting the program requirements. Section 902(a) of Act 101, 53 P.S. § 4000.902(a). The grant for establishing a municipal recycling program is specified to be 90% of the approved cost of such program. *Id.* Section 903 directs the Department to award grants to reimburse counties for authorized costs incurred for the salary and expenses of recycling coordinators up to 50% of the approved cost. 53 P.S. § 4000.903. Section 904 directs the Department to award annual performance grants for municipal recycling programs, upon application from a municipality, but only if the materials collected were actually marketed. 53 P.S. § 4000.904.

In its municipal waste management plan, each county is directed to describe the "[e]stimated costs of operating and maintaining a recycling program, estimated *revenue from the sale or use of materi-*

---

11. Pursuant to Act 101, a "[m]unicipality" is defined as "[a] *county*, city, borough, incorporated town, township or home rule municipal-ity." Section 103 of Act 101, 53 P.S. § 4000.103 (emphasis added).

*als and avoided costs* of processing or disposal." Section 502(e)(1)(x) of Act 101, 53 P.S. § 4000.502(e)(1)(x) (emphasis added). The plan must set forth the "[p]otential benefits of recycling, including the potential solid waste reduction and *the avoided cost* of municipal waste processing or disposal." 53 P.S. § 4000.502(e)(1)(ii) (emphasis added). There is no mention of revenue from other sources.

Apparently recognizing that the funding scheme originally provided for by Act 101 may not be enough to accomplish the purpose, Section 1513 of Act 101 requires the Department to develop a plan to assist municipalities in making recycling programs *"financially self-sufficient."* 53 P.S. § 4000.1513 (emphasis added). Specifically, the Department's plan is to include a market development program (to be funded by the Recycling Fund), address the extent to which municipal recycling programs can be sustained by restructuring the allocation of available recycling grants, include recommendations to county recycling coordinators designed to encourage market development, and identify the specific means, including legislative changes, that the Department intends to use to assist municipalities in making their recycling programs self-sufficient. *Id.*

Moreover, the General Assembly did not intend the Recycling Fund to be the long-term mechanism for supporting Act 101's programs. Act 101 provides a sunset provision for the $2 fee, directing its termination after January 1, 2020. Section 701(d) of Act 101, 53 P.S. § 4000.701(d). Clearly, the end goal is self-sufficiency. *See id.;* 53 P.S. § 4000.1513; *Northumberland.* However, it is contemplated that self-sufficiency may be beyond the capabilities of municipalities and the Department, ultimately requiring further legislative action. *See* 53 P.S. § 4000.1513(4).

In *Northumberland, Lehigh* and *Monroe,* this Court examined Act 101's funding scheme and whether local administrative fees are preempted by Act 101. We determined that, in the absence of specific authorization, administrative fees imposed by municipalities to help fund their recycling programs are inconsistent with Act 101 and are preempted. *Monroe; Lehigh; Northumberland.*

First, in *Northumberland,* an association of waste haulers challenged an administrative fee imposed by counties and a municipal authority to help fund their recycling programs. This Court determined Act 101 preempted these entities from imposing their own administrative fee on waste haulers to help fund their recycling programs. We explained the General Assembly did not intend Act 101 to be supplemented by municipal bodies. "Act 101 provides a comprehensive recycling plan that provides a specified funding source and *does not provide any authority to raise revenue by other means." Id.* at 1110 (emphasis added). We concluded an administrative body could only impose a fee if it is expressly authorized by Act 101; such authorization did not exist. *Id.*

Shortly thereafter, this Court considered *Lehigh,* in which waste haulers and landfill operators challenged the county's imposition of an administrative fee to be paid by the waste haulers to subsidize its municipal waste management plan. Relying on *Northumberland,* we similarly concluded Act 101 preempted the county from imposing such a fee.

More recently, in *Monroe,* this Court examined *Northumberland* and *Lehigh* in the context of a waste hauler's challenge of a county authority's power to set tipping fees for waste disposal at privately-owned waste disposal facilities to offset the cost of its waste management system and debt service. These fees covered dis-

posal costs in the landfills as well as administrative costs and costs of other aspects of the county-wide disposal plan. We determined the authority was authorized to set and collect administrative fees related to its implementation and administration of the county's *solid waste* management plan under the SWMA. We opined the authority's local administrative fees were statutorily authorized under the Municipality Authorities Act,[12] did not conflict with provisions of Act 101, and did not cover recycling programs, for which Act 101 provided a comprehensive recycling plan that preempted unauthorized local recycling fees. *Monroe.*

Differing somewhat from our discussion in *Northumberland* and *Lehigh,* in *Monroe* we applied a more robust analysis of preemption. We explained there are three forms of preemption in Pennsylvania: (1) express preemption, based on express statutory declarations; (2) field preemption, where the statute is silent on preemption but pervasively regulates a field; and, (3) conflict preemption, where a local regulation is inconsistent with a state statute. *Monroe,* 80 A.3d at 559 (citing *Nutter v. Dougherty,* 595 Pa. 340, 938 A.2d 401 (2007)); *accord Hoffman Min. Co., Inc. v. Zoning Hr'g Bd. of Adams Twp.,* 612 Pa. 598, 32 A.3d 587 (2011). We determined "Act 101 contains an express preemption provision predicated on inconsistency of municipal regulations of municipal waste disposal and state regulation." *Monroe,* 80 A.3d at 559 (quoting *City of Reading v. Iezzi,* 78 A.3d 1257 (Pa.Cmwlth.2013), *vacated on other grounds, In re Iezzi,* 504 B.R. 777 (Bankr.E.D.Pa.2014) (unreported)) (emphasis omitted).[13]

Discussing *Lehigh* and *Northumberland,* in *Monroe* we held Act 101's express preemption language preempted the imposition of an otherwise unauthorized local service charge or fee to fund recycling programs, not solid waste. We opined the *express* preemption language of Act 101 did not contemplate *field* preemption. *Monroe.* Other municipal action may be tolerated if not inconsistent with the provision and purposes of Act 101. We continued:

> [T]he first express purpose of Act 101 is to '[e]stablish and maintain a cooperative State and local program of planning and technical and financial assistance for comprehensive municipal waste management.' Section 102(b)(1) of Act 101, ... 53 P.S. § 4000.102(b)(1).... This language anticipates some local financial assistance.

*Id.* at 560 (emphasis omitted). Although Act 101 preempted local fees covering recycling programs, we determined the Act did not preempt other local fees covering waste management otherwise permitted by statute and not inconsistent with Act 101's provisions. *Id.*

■ The parties rely on the above precedent in support of their respective positions. Waste Management contends the County's RFP request for "voluntary" support is not expressly authorized by Act 101 and is prohibited as an unauthorized administrative fee. It maintains Act 101 does not permit the County to raise revenue by other means than those set forth in Act 101. The County counters legal precedent merely forbids the imposition of a mandatory fee, not the solicitation for voluntary support. It asserts Act 101 anticipates some local financial assistance. The

---

12. 53 Pa.C.S. §§ 5601–5623.

13. The United States Bankruptcy Court for the Eastern District of Pennsylvania voided the decision because it was unknowingly entered after the appellant filed for bankruptcy and, thus, was in technical violation of the automatic stay.

Department concurs that *Northumberland* and progeny do not prohibit requests for voluntary support, but it argues their holdings should be revisited because the Court did not consider or appreciate the limited availability of state funding.

Unfortunately, the parties spend most of their efforts discussing recent cases, and much less effort analyzing the provisions of Act 101. As addressed most recently in *Monroe,* the type of preemption contemplated by Act 101 is not field preemption, or even conflict preemption as advanced by Waste Management, but rather, express preemption. *Monroe.*

Regarding counties, preemption is found in Section 303 of Act 101. 53 P.S. § 4000.303. After granting counties broad power to ensure "the availability of adequate permitted processing and disposal capacity for municipal waste . . . generated within its boundaries[,] . . ." Section 303 of Act 101 permits a county to:

[ (a) ](4) . . . adopt ordinances . . . for the recycling of municipal waste or source-separated material if one of the following requirements are [sic] met:

(i) *Such ordinances* . . . are set forth in the approved plan and *do not interfere with the implementation of any municipal recycling program* under section 1501 [53 P.S. § 4000.1501].

\* \* \*

(c) . . . In carrying out its duties under this section, a *county may adopt ordinances* . . . for the processing and disposal of municipal waste, *which shall not be* less stringent than, and not *in violation of or inconsistent with the provisions and purposes of* the [SWMA], *this act* and the regulations promulgated pursuant thereto.

53 P.S. § 4000.303(a)(4)(i), (c) (emphasis added).

Further, it is clear that Act 101 contemplates some local financial assistance. *Monroe.* Contrary to Waste Management's arguments, the statute does not restrict local financial assistance to public sources. Instead, among its enumerated purposes, Act 101 is designed to *"[u]tilize, wherever feasible, the capabilities of private enterprise* in accomplishing the desired objectives of an effective, comprehensive solid waste management plan." 53 P.S. § 4000.102(b)(5). In addition, the purpose of Act 101 is to "[e]stablish and maintain a cooperative State and local program of planning and technical and financial assistance for comprehensive municipal waste management." 53 P.S. § 4000.102(b)(1).

As discussed above, Act 101 does not contemplate local recycling fees to fund recycling programs, and it does not authorize such fees. *Lehigh; Northumberland.* However, the statute expressly anticipates "avoided costs" of municipal waste processing or disposal as part of the process for estimating program costs. 53 P.S. § 4000.502(e)(1)(x). In particular, the statute provides that each county plan must describe and evaluate:

Estimated costs of operating and maintaining a recycling program, estimated revenue from the sale or use of materials *and avoided costs of processing or disposal.* This estimate shall be based on a comparison of public and private operation of some or all parts of the recycling program.

*Id.* (emphasis added).

In a similar vein, the General Assembly referenced "avoided costs" in connection with an affirmative defense available to municipalities *other than counties* where the failure to comply with Act 101's mandatory provisions was caused by excessive program costs. Section 1712 of Act 101,

53 P.S. § 4000.1712(a). Significantly, the General Assembly explained:

> Program costs are excessive when reasonable and necessary costs of operating the program exceed [ (1) ] income from the sale or use of collected material, [ (2) ] grant money received from the [D]epartment pursuant to [S]ection 902 and [ (3) ] *avoided costs of municipal waste processing or disposal.*

*Id.* (emphasis and clause numbers added). Although Act 101's affirmative defense provision is not available to counties, the legislature's explanation of excessive program costs and contemplation of avoided costs as part of the funding scheme nevertheless is instructive and is consistent with the provisions expressly applicable to counties. *See* 53 P.S. § 4000.502(e); 53 P.S. § 4000.902(a); 53 P.S. § 4000.903; 53 P.S. § 4000.904.

Upon review, rather than prohibiting a municipality's efforts to avoid costs of its municipal waste processing or disposal programs, the statute anticipates such efforts. In other words, Act 101 treats avoided program costs the same as grant money from the Department and income from the sale or use of collected material. Significantly, Act 101 treats avoided program costs (which it specifically mentions) differently than local recycling fees (which it does not mention).

At this early stage of litigation, we reject any argument that the County's efforts here render the funding system non-uniform, as a matter of law. On its face, Act 101 allows any municipality, including counties, to attempt to avoid program costs. *See* 53 P.S. § 4000.502(e)(1)(ii), (x).

Similarly, at this point, we cannot determine as a matter of law that the County's proposed plan will have a negative impact on sustainability and ultimate self-sufficiency of its recycling program. *See* Section 1513 of Act 101, 53 P.S. § 4000.1513.

To the contrary, the County's proposed plan would seem to enhance the sustainability of its recycling program. Also, prior to hearing, we cannot determine whether the County's proposed plan will interfere with the implementation of any municipal recycling program. *See* Section 303(a)(4) of Act 101.

Recently, in *City of Reading,* we found fault with an unauthorized local fee which covered all costs of recycling. One of the reasons for our criticism was that, by covering "all costs associated with the recycling program," the fee made waste reduction and the marketing of recyclables unnecessary, contrary to the purpose of Act 101. *Id.* at 1268; *see Monroe.* We confirm our reasoning in *City of Reading.* However, that case was decided *after* a bench trial. We are not at the hearing stage in this case. Accordingly, it is too early to determine as a matter of law whether the County's proposed plan will have a deleterious effect on the arguably "topped-out" efficiencies of the County's recycling program.

Going forward, the "avoided costs" approach to sustaining these programs is clearer with regard to programmatic support and "in-kind" services, as opposed to straight financial contributions. Nevertheless, we await the opportunity to review a full record before making a decision. In any event, we do not view the parties' mandatory/voluntary distinction as useful, as it finds no support in the language of the statute.

## IV. Conclusion

For all these reasons, we discern no error of law in the Board's decision to deny summary judgment to Waste Management.

## ORDER

**AND NOW,** this 8th day of January, 2015, the order of the Environmental

Hearing Board denying the motion for summary judgment is **AFFIRMED.**