IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Alan Ziegler and Nicolas Bene and    :
Lissette Chevalier and Jose Munoz,    : No. 10 C.D. 2015
and Efrain Caban, Individually and    : Argued: February 10, 2016
on behalf of all similarly situated persons,    :
   :
               Appellants    :
   :
          v.    :
   :
City of Reading and Reading    :
Area Water Authority    :

BEFORE:   HONORABLE MARY HANNAH LEAVITT, President Judge
             HONORABLE RENÉE COHN JUBELIRER, Judge
             HONORABLE ROBERT SIMPSON, Judge
             HONORABLE P. KEVIN BROBSON, Judge
             HONORABLE PATRICIA A. McCULLOUGH, Judge
             HONORABLE ANNE E. COVEY, Judge
             HONORABLE MICHAEL H. WOJCIK, Judge

OPINION BY JUDGE WOJCIK            FILED: April 20, 2016

Appellants (Residents)[1] ask whether the Court of Common Pleas of Berks County (trial court) erred in declaring a residential curbside recycling fee is authorized by the City of Reading's (City) newly enacted ordinances and is not in violation of the Municipal Waste Planning, Recycling, and Waste Reduction Act (Act 101).[2] Residents contend the City's ordinances, which provide for a curbside recycling fee, are preempted by Act 101. They assert the Third Class City Code[3]

---

[1] Residents are Alan Ziegler, Nicholas Bene, Lissette Chevalier, Jose Munoz, and Efrain Caban, individually and on behalf of all similarly situated persons.

[2] Act of July 28, 1988, P.L. 556, *as amended*, 53 P.S. §§4000.101-4000.1904.

[3] *Formerly* the Act of June 23, 1931, P.L. 932, *as amended*, 53 P.S. §§35101-39701, repealed and codified, effective January 25, 2016, 11 Pa. C.S. §§10101-14702.

does not otherwise authorize the City to impose recycling fees because the City is organized and operates under a home rule charter. They claim the trial court erred in considering how other municipalities fund their recycling programs, and that the City disregarded permissible alternative options to fund its recycling program. Upon review, we find it necessary to vacate and remand for further analysis based on our recent decision in *Waste Management of Pennsylvania, Inc. v. Department of Environmental Protection,* 107 A.3d 273 (Pa. Cmwlth. 2015) (*en banc*), which was filed approximately one month after the trial court's decision here.

## I. Background

The City is a third class city located in Berks County, operating under a home rule charter. The Reading Area Water Authority (RAWA) is a municipal authority created under the Municipality Authorities Act.[4] The City delegated the responsibility for solid waste planning and plan implementation under Section 303(d) of Act 101, 53 P.S. §4000.303(d), to RAWA. Residents either reside in or maintain a place of business in the City and have paid recycling fees to the City or RAWA.

In June 2014, Residents filed a class action complaint against the City and RAWA (collectively, City), challenging the City's assessment and collection of a service fee for curbside recycling. In one count, Residents sought a declaratory judgment that the City's ordinances, which authorized the curbside recycling fees, violated Act 101 and the Solid Waste Management Act[5] (SWMA).

---

[4] 53 Pa. C.S. §§5601-5623.

[5] Act of July 7, 1980, P.L. 380, *as amended*, 35 P.S. §§6018.101-6018.1003.

2

In response, City filed preliminary objections to the complaint, which included objections that Residents did not exhaust an exclusive and adequate statutory remedy and that class action status was not maintainable. Residents, in turn, filed a motion for preliminary injunction to enjoin the City from assessing and collecting curbside recycling fees. The parties agreed to defer all motions and pleadings until the trial court ruled on the count for declaratory judgment.

Thereafter, the parties filed a joint stipulation of facts containing 120 facts, and briefs in support of their positions. In response to the trial court's request for supplemental data, the parties filed a supplemental stipulation of facts adding 68 additional facts. The facts, which are not in dispute, can be summarized as follows.

In 1988, the General Assembly passed Act 101. Joint Stipulation, 9/3/14, at ¶1. Section 1501 of Act 101, 53 P.S. §4000.1501, mandates municipalities with populations over 10,000, which includes the City, to establish and implement recycling programs. *Id.* at ¶3. In 1991, while operating under the Third Class City Code, the City enacted Ordinance 21-1991 pursuant to Act 101, which imposed a curbside recycling fee on persons owning property within its borders. *Id.* at ¶9. In 1996, the City adopted a home rule charter pursuant to the Home Rule Charter and Optional Plans Law[6] (Home Rule Law), and it continued collecting the recycling fee. *Id.* at ¶6.

From 1991 through 2012, the City contracted with private haulers to collect curbside recycling. Joint Stipulation at ¶12. In 2012, the City began in-

_____

[6] 53 Pa. C.S. §§2901-3171.

house collection of recyclables and delegated the responsibility to RAWA. *Id.* at ¶¶40-42.

The City assessed a fee for the collection of recyclable materials from 1991 until November 2013. Joint Stipulation at ¶24. In November 2013, following this Court's decision in *City of Reading v. Iezzi*,[7] the City temporarily suspended the assessment and collection of curbside recycling fees. Joint Stipulation at ¶¶24, 100.

In March 2014, the City revised its ordinance relating to the collection of curbside waste, including recycling, by enacting Ordinances 20-2014 and 21-2014. Joint Stipulation at ¶¶33, 34; *see* Reproduced Record (R.R.) at 86a-92a. Ordinance 20-2014 replaced the solid waste fee and recycling fee with a single "curbside waste collection fee." Joint Stipulation at ¶33. Ordinance 20-2014's definition of "curbside waste" includes recyclables. *Id.* at ¶34. Ordinance 21-2014 set the amount of the new "curbside waste collection fee" of $303.10. *Id.* at ¶¶36, 37. Imbedded in that fee is a service fee for recycling of $91.83. *Id.* at ¶37. The ordinances apply to owners of residential properties with four or fewer units; they are not permitted to use a private hauler for curbside recycling. *Id.* at ¶¶10, 29. In April 2014, the City resumed assessment and collection service fees for curbside recycling. *Id.* at ¶103.

To operate its curbside recycling collection program, the City budgeted $2,400,000 in 2014, $2,774,905 in 2013, and $2,614,616 in 2012. Joint

---

[7] 78 A.3d 1257 (Pa. Cmwlth. 2013) *(Iezzi), vacated on other grounds, In re Iezzi*, 504 B.R. 777 (Bankr. E.D. Pa. 2014). In *Iezzi*, we held that the City's fee covering all costs of recycling was preempted by Act 101. On January 31, 2014, the U.S. Bankruptcy Court for the Eastern District of Pennsylvania issued an order declaring that our decision in *Iezzi* was void *ab initio* because the appellant declared bankruptcy prior thereto without providing notice to this Court. *In re Iezzi.* Thus, our decision was inadvertently entered during the pendency of the automatic stay. *Id.*

4

Stipulation at ¶¶17-19. The City's budgeted expenditures for its recycling program include 1 part-time and 15 full-time employees. *Id.* at ¶20. The City pays $1,022,033 a year in salaries, temporary wages, fringe benefits and pensions. *Id.*

The City's funding for the recycling program comes from three main financial sources: the fee, which is the subject of this challenge; grants under Sections 902 and 904 of Act 101, 53 P.S. §§4000.902, 4000.904; and, the marketing and sale of recycled materials. Joint Stipulation at ¶¶36-40, 54-88, 94. The City currently collects approximately $2,300,000 in recycling fees and less than $100,000 from the marketing and sale of recyclable materials per year. *Id.* at ¶¶21, 94.

The Pennsylvania Department of Environmental Protection (DEP),[8] awarded the City grants under Sections 902 and 904 of Act 101. Joint Stipulation at ¶¶54, 58, 67, 73-83, 85-87. Section 902 grants can be used for limited purposes while Section 904 grants, also known as performance grants, may be used for any lawful purpose. *Id.* at ¶¶46, 49.

Municipalities may apply for Section 902 grants periodically, but not on an annual basis. Joint Stipulation at ¶47. The City did not seek Section 902 grants from 2009 to 2011. *Id.* at ¶65. The City most recently received a Section 902 grant of $250,000 in January 2013. *Id.* at 67. Since Act 101 was passed, the City has received less than $2 million in Section 902 grants. *Id.* at ¶71.

Municipalities may apply for Section 904 grants annually. *See* Joint Stipulation at ¶¶73-87. Section 904 performance grants are awarded based on the

---

[8] DEP is the Commonwealth agency responsible for administering municipal waste planning, recycling and reduction, and awarding grants for the development and implementation of municipal recycling programs. Sections 301(1) & 902(a) of Act 101, 53 P.S. §§4000.301(1), 4000.902(a).

5

tonnage of recyclable materials collected in the municipality and actually marketed. *Id*. at ¶¶51. The City received Section 904 performance grants in the amount of $86,132 in materials collected and marketed in 2010, $96,168 for 2011, and $86,760 for 2012. *Id.* at ¶¶85-87. In previous years, the Section 904 grants were larger before DEP reduced the recyclable grants by 60% in 2011 in order to ensure the sustainability of the Recycling Fund. *Id.* at ¶84. The City does not have records indicating it received 904 grants prior to 2000. *Id.* at ¶72.

The City never requested an exemption from Act 101's mandate to establish a recycling program. Joint Stipulation at ¶96. The City never filed an application to implement an alternative recycling program. *Id.* at ¶97. At no time has the City complained, petitioned or otherwise notified DEP that it should be relieved of its Act 101 obligations because its recycling program costs are excessive. *Id*. at 105.

Volume-wise, the City averages approximately 12,000 tons of residential and commercial recyclable materials that are collected and marketed per year. *See* Joint Stipulation at ¶¶81-83, 85-87.

In the supplemental stipulation, the parties provided statistics on comparable cities' recycling programs. The comparable cities included Bethlehem, Lancaster, York, Allentown, Wilkes-Barre and Scranton, which are a variety of three third class cities, two third class cities with home rule charters, and one second class A city with a home rule charter. Supplemental Stipulation, 11/6/14, at ¶¶1, 13, 24, 35, 49, 58. Four cities surveyed largely depend on the assessment and collection of recycling fees to fund their recycling programs. *Id*. at ¶¶19, 20, 30, 42, 53, 54, 64, 65. Although the City of Scranton collects a waste disposal collection fee, which excludes recyclables, the revenues generated are

6

deposited in the city's general fund, which in turn funds the city's recycling program. *Id*. at ¶¶43, 46, 47. Significantly, the Cities of Lancaster, Scranton and York realized no revenue from the marketing and sale of collected recyclables in 2013. *Id*. at ¶¶27, 38, 61.

On December 5, 2014, the trial court entered an order granting declaratory judgment in favor of the City. In the accompanying opinion, the trial court explained its decision was not controlled by *Iezzi* because: (1) *Iezzi* was voided by the U.S. Bankruptcy Court; (2) the parties provided relevant stipulations of fact, which were not before the Court in *Iezzi*; (3) Act 101 does not explicitly permit or prohibit recycling fees, and relevant case law interpreting Act 101 only prohibits fees that cover *all* costs associated with the recycling program; and, (4) after *Iezzi*, the General Assembly amended the Third Class City Code to specifically allow third class cities to assess and collect rates for the collection, removal and disposal of recyclable materials.

With regard to the central legal issue, whether the City's new "curbside waste collection fee" is inconsistent with, and therefore preempted by, Act 101, the trial court's entire discussion follows:

> This Court finds that the City's recycling program is not solely supported by the recycling fee. In addition, without the fee, maintaining the recycling program would be impossible. Using the [*Pennsylvania Waste Industries Association v. Monroe County Municipal Waste Management Authority*, 80 A.3d 546 (Pa. Cmwlth. 2013) (*en banc*)] analysis, because the City uses grants and recyclable sales to supplement the recycling fee, and because the Act 101 mandated recycling program couldn't survive without the fee, the fee itself supports Act 101's primary purpose of alleviating the growth of landfills and the subsidization of the costs with the sale

7

of recyclables and state grants, comporting with both the
spirit and the letter of Act 101.

Trial Court Opinion, 12/5/14, at 11.

On December 15, 2014, the trial court amended its order so that it could be appealed in the event this Court considered the initial order interlocutory. Residents appealed to this Court,[9] and they filed a concise statement of errors complained of on appeal with the trial court. In response, the trial court issued an order adopting its earlier-filed opinion. This appeal followed.[10]

## II. Issues

Residents contend the City's ordinances, which provide for a curbside recycling fee, are preempted by Act 101. According to Residents, the City is not

---

[9] The City suggests that this Court may lack jurisdiction over this appeal because Residents filed their petition for permission to appeal on January 6, 2015, which was 32 days after the entry of the trial court's December 5, 2014 Order. Notwithstanding the untimeliness contention, the City asserts the appeal should not be dismissed. Appellees' Brief at 1.

However, the trial court amended its order on December 15, 2014, to express the statement specified in 42 Pa. C.S. §702(b) that the declaratory judgment order "involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the matter." Trial Court's Amended Order, 12/15/14, at 1. Residents requested permission to appeal the amended order.

This Court determined the amended order constituted a final order and was immediately appealable as of right. Commonwealth Court Order, 1/26/15 (Quigley, S.J.) (citing Pa. R.A.P. 341(b); 42 Pa. C.S. §7532; *Nationwide Insurance Co. v. Wickett*, 763 A.2d 813 (Pa. 2000)). We treated Residents' petition for permission to appeal as a notice of appeal. *Id.* As Residents filed their petition within 30 days of the trial court's amended order, we conclude the appeal was timely filed. *See* Pa. R.A.P. 1316 (a timely petition for permission to appeal shall be treated as a timely notice of appeal); *see also Commonwealth v. Shull*, 811 A.2d 1, 3 n.3 (Pa. Super. 2002) (holding where a petition to file an interlocutory appeal by permission is incorrectly filed within 30 days of the order to be reviewed, it must be treated as a timely filed notice of appeal).

[10] Our review in a declaratory judgment action is limited to determining whether the trial court's findings are supported by substantial evidence, whether an error of law was committed or whether the trial court abused its discretion. *Pennsylvania Independent Waste Haulers Association v. Township of Lower Merion*, 872 A.2d 224, 227 n.13 (Pa. Cmwlth. 2005). However, where an appeal presents questions of law, our standard of review is *de novo* and our scope of review is plenary. *Pennsylvania Waste Industries Association v. Monroe County Municipal Waste Management Authority*, 80 A.3d 546, 551 (Pa. Cmwlth. 2013) (*en banc*).

8

otherwise authorized by statute to assess and collect a recycling fee. Although the General Assembly amended the Third Class City Code thereby authorizing third class cities to impose recycling fees, the Code does not apply to the City because the City is organized and operates under a home rule charter. In addition, Residents claim the trial court erred by considering what other local governments do in determining whether the City can implement a curbside service fee to fund its recycling program. Finally, Residents maintain the City disregarded permissible alternative options to imposing a recycling fee under Act 101.

### III. Discussion
### A. Preemption
### 1. Contentions

First, Residents contend the City's new ordinances establishing a fee to fund its recycling program violates Act 101 and SWMA. In Act 101, the General Assembly designated the type of fees that can be collected and which entity is legally entitled to collect them. These fees are a $2 per ton recycling fee imposed on operators of municipal waste landfills or resource recovery facilities to be paid to the DEP and a host municipality benefit fee of $1 per ton to be paid to the operator of a municipal waste landfill or resource recovery facility. Sections 701 & 1301 of Act 101, 53 P.S. §§4000.701, 4000.1301. A fee imposed on property owners for curbside recycling collection is not delineated under Act 101. A municipality can only impose a recycling fee if it is authorized. Under Act 101, municipalities are to use planning, grants and other incentives, as well as revenue realized from the marketing of recyclables, to fund the recycling programs, nothing more.

In addition, Residents claim the City's ordinances contravene this Court's prior authority, which have consistently held recycling fees are preempted

9

because they conflict with Act 101. *See Waste Management*, 107 A.3d at 286; *Monroe County*, 80 A.3d at 560*; Iezzi*, 78 A.3d at 1268;[11] *IESI PA Bethlehem Landfill Corp. v. County of Lehigh*, 887 A.2d 1289, 1292 (Pa. Cmwlth. 2005) (*Lehigh County*)*; Pennsylvania Independent Waste Haulers Association v. County of Northumberland*, 885 A.2d 1106, 1111 (Pa. Cmwlth. 2005) (*Northumberland County*), *appeal denied*, 917 A.2d 316 (Pa. 2006).

More particularly, in *Northumberland County*, the Court held Act 101 provides a comprehensive recycling plan that provides a specified funding source and does not provide any authority to raise revenue by other means. 885 A.2d at 1110. Most recently, this Court, in *Waste Management*, 107 A.3d at 286, reaffirmed that "Act 101 does not contemplate local recycling fees to fund recycling programs, and it does not authorize such fees." Significantly, in *Iezzi*, this Court struck down a similar service fee to cover the costs of the City's recycling program. 78 A.3d at 1268.

Contrary to the City's assertions, there is no statutory or common law basis for permitting recycling fees that only *partially* fund a recycling program. To the extent the fee in *Iezzi* referred to a fee that covered "all costs," the Court merely pointed to language contained in the City's former ordinance. Although the City's new ordinances changed the terminology, the ordinances contain the same language as before – "a service fee to cover *all* costs associated with the collection and removal of all curbside waste." Section 496-208(2) of Ordinance 20-2014; R.R. at 87a. Residents raise the same facial challenge that was raised in *Iezzi*. Therefore, the same result in *Iezzi* should apply here.

---

[11] Notwithstanding the nullification of this decision by the U.S. Bankruptcy Court, *In re Iezzi*, we recently confirmed our preemption reasoning in *Waste Management*.

The City responds that its curbside waste fee is not inconsistent with the provisions or purposes of Act 101. The General Assembly's intent in enacting Act 101's preemption provision was to avoid "inconsistency of municipal regulations of municipal waste disposal and state regulation." *Monroe County*, 80 A.3d at 559. Funding of municipal recycling programs is done "through planning, grant, and other incentives" because Act 101 contains "no mention of recycling revenue from other sources." *Iezzi*, 78 A.3d at 1265.

The City concedes "a municipality's imposition of a service charge which covered *all* costs of its recycling program [is] inconsistent with the comprehensive statewide recycling funding provisions in Act 101 and related statutes." *Monroe County*, 80 A.3d at 559 (emphasis added). However, the City attempts to assert an as-applied defense. Although language of the ordinance recommends a fee that covers all costs for curbside waste, in actuality, the recycling fee does not cover *all* costs of the City's recycling program. The City uses the recycling fee to supplement Act 101 grants and revenue from recyclable sales. In so doing, the City is acting consistent with the provisions and purposes of Act 101 because it encourages waste reduction and marketing of recyclables. *See Iezzi*, 78 A.3d at 1268.

The City further maintains that Act 101's funding mechanisms, standing alone, are insufficient to cover operating costs. Indeed, the program costs greatly exceed the sum of available funds from the state and revenue realized from the marketing of recyclables, creating a gap of over $2 million. Although Act 101 is silent with regard to the imposition of fees for curbside recycling, a comprehensive reading of Act 101 demonstrates that the General Assembly did not intend to impede a municipality's ability to fill this gap through the imposition of a

11

reasonable fee to support a mandatory curbside collection program. The General Assembly is well aware of the funding gap in Act 101. The General Assembly never intended to displace the authority of municipalities to enact the most obvious and equitable means of filling that gap.

Since the enactment of Act 101, the General Assembly amended both the Second Class City Code[12] and Third Class City Code by specifically authorizing the implementation and collection of a recycling collection fee. The amendments to the Codes conclusively demonstrate that the General Assembly does not view curbside waste fees as inconsistent with the provisions of Act 101. Because the City's curbside waste fee is "otherwise authorized by statute," *Monroe County*, 80 A.3d at 559, and is not inconsistent with Act 101's provisions and purposes, it follows that Act 101 does not preempt it.

In addition, the City urges the Court to reconcile any perceived inconsistency based on prior case law by allowing municipalities to charge recycling fees provided they do not cover *all* costs and they utilize grants, offsets and other incentives to fund the program. *See Iezzi*, 78 A.3d at 1257. Had the General Assembly wished to impose a significant limitation on municipalities' ability to offset what is essentially a huge, unfunded mandate, it would have done so explicitly in Act 101. It would be absurd to mandate municipalities to implement recycling programs but yet deny them the ability to adequately fund them. As the trial court aptly observed, if "the City is not authorized to collect a recycling fee" that "would likely result in the elimination of the established recycling program." Trial Court Opinion at 9. Such an interpretation is contrary to

---

[12] Act of March 31, 1927, P.L. 98, *as amended*, 53 P.S. §§22101-28707.

12

Act 101's fundamental purpose of alleviating the rapidly diminishing disposal capacity for municipal waste. *See* Section 102(a) of Act 101, 53 P.S. §4000.102(a).

Finally, the City argues Residents have not shown any violation or inconsistency with Act 101 to justify express or conflict preemption. To the contrary, the ordinances, which fund the City's recycling program, further the fundamental purpose of Act 101 by encouraging development of waste reduction and recycling. The fee in this case is compatible with the goals and funding scheme expressed in Act 101 because, unlike in *Iezzi*, the current service charge fills the funding gap, but it does not cover "all costs."

## 2. Analysis

"In Act 101, the General Assembly addressed the municipal waste industry in order to provide a comprehensive program of ensuring adequate planning and implementation of future disposal capacity as well as encouraging more recycling efforts." *Waste Management*, 107 A.3d at 282 (quoting *Monroe County*, 80 A.3d at 549). The General Assembly declared waste reduction and recycling are preferable to processing or disposal of municipal waste. Section 102(a)(8) of Act 101, 53 P.S. §4000.102(a)(8). Indeed, the promotion of "source separation of marketable materials on a Statewide basis so that reusable materials may be returned to the economic mainstream in the form of raw materials or products rather than be disposed of or processed at the Commonwealth's overburdened municipal waste processing disposal facilities" is in the public interest. 53 P.S. §4000.102(a)(14).

Among the many enumerated purposes, Act 101 is designed to:

13

(1) Establish and maintain a cooperative State and local program of planning and technical and financial assistance for comprehensive municipal waste management.

(2) Encourage the development of waste reduction and recycling as a means of managing municipal waste, conserving resources and supplying energy through planning, grants and other incentives.

* * *

(4) Provide a flexible and effective means to implement and enforce the provisions of this act.

Section 102(b) of Act 101, 53 P.S. §4000.102(b). The terms and provisions of Act 101 are to be liberally construed, so as to best achieve and effectuate its goals and purposes. Section 104(a) of Act 101, 53 P.S. §4000.104(a); *Waste Management*, 107 A.3d at 282.

In furtherance of these goals, Section 304(a) of Act 101, 53 P.S. §4000.304(a), provides each municipality:

shall have the power and its duty shall be to assure the proper and adequate transportation, collection and storage of municipal waste which is generated or present within its boundaries, to assure adequate capacity for the disposal of municipal waste generated within its boundaries by means of the procedure set forth in section 1111, and to adopt and implement programs for the collection and recycling of municipal waste or source-separated recyclable materials as provided in this act.

Act 101 permits each municipality to adopt supplemental ordinances "not in violation of or inconsistent with, the provisions and purposes of [SWMA], this act and the regulations promulgated pursuant thereto." Section 304(b)(1) of Act 101, 53 P.S. §4000.304(b)(1).

This Court described the latter provision as an example of express, rather than conflict, preemption. *Waste Management,* 107 A.3d at 286; *Monroe County,* 80 A.3d at 560. In *Monroe County*, we described three forms of

14

preemption: (1) express preemption, based on express statutory declarations; (2) field preemption, where the statute is silent on preemption but pervasively regulates a field; and, (3) conflict preemption, where a local regulation is inconsistent with a state statute. We opined "Act 101 contains an express preemption provision predicated on inconsistency of municipal regulations of municipal waste disposal and state regulation." *Id.* at 559 (quoting *Iezzi*, 78 A.3d at 1264) (emphasis removed).

In rejecting field preemption, we explained, "there are indications that the Legislature intended that other municipal action may be tolerated if not inconsistent with the provisions and purposes of Act 101." *Id.* at 560. "[T]he first express purpose of Act 101 is to "[e]stablish and maintain a cooperative State and local program of planning and technical and financial assistance for comprehensive municipal waste management." Section 102(b)(1) of Act 101, 53 P.S. §4000.102(b)(1). This language anticipates some local financial assistance. *Monroe County*, 80 A.3d at 560.

Insofar as Residents assert conflict preemption, we note express and conflict preemption are similar in that they both preclude inconsistent legislation. *California Federal Savings & Loan Association v. Guerra*, 479 U.S. 272, 282 (1987). The main difference is that, in the context of conflict preemption, a court is inferring legislative intent, rather than reading express language in the text of the statute. *Id.*

In *Northumberland County*, this Court held Act 101 preempted four counties and a municipal authority from imposing an administrative fee on waste haulers to help fund recycling programs. There, the administrative fee involved was duplicative of a fee already imposed by Section 701(a) of Act 101, 53 P.S.

15

§4000.701(a). 885 A.2d at 1110. Act 101 did not authorize the counties or the municipal authority to impose their own administrative fee in addition thereto. *Id.* at 1111. Because Act 101 provided a specified funding source, and it did not authorize municipalities to impose its own fee, we determined the fee was inconsistent with Act 101. *Id.*

We applied the same analysis in *Lehigh County* to a similar administrative fee on waste haulers to fund recycling programs. We likewise held the administrative fee was preempted by Act 101. 887 A.2d at 1292. Our decisions in *Lehigh County* and *Northumberland County* "are limited to *unauthorized* recycling fees." *Monroe County*, 80 A.3d at 559 (emphasis added).

Later in *Iezzi*, we examined whether the City's prior ordinance, which imposed a "service fee to cover all costs associated with the recycling program" was preempted by Act 101 or SWMA. 78 A.3d at 1268. We determined neither Act 101 nor SMWA expressly granted the power to charge such a fee. We also concluded the fee was inconsistent with the purpose of Act 101. *Id.* We explained that, because the fee covered "*all* costs associated with the recycling program," it did not encourage "waste reduction and marketing of recyclables, nor [did] it use planning, grants or other incentives to attain increased efficiency" inconsistent with Act 101's purpose. *Id.* (emphasis added).

Although neither Act 101 nor SWMA expressly authorize municipalities to charge such fees, they also do not necessarily preclude them. Significantly, "[t]his Court has never held that Act 101 preempts other municipal charges that are *otherwise authorized by statute ....*" *Monroe County*, 80 A.3d at 559 (emphasis added).

16

Significant to our disposition, the General Assembly authorized the imposition of recycling fees in other statutes. The General Assembly amended both the Second Class City Code and the Third Class City Code after the enactment of Act 101 to provide for the imposition and collection of recycling fees. Of import here, in 2014, after *Iezzi*, the General Assembly added Section 2409 of the Third Class City Code.[13] This section provided third class cities "may *establish, alter, charge and collect rates and other charges for: (i) the collection, removal and disposal of* ashes, garbage, solid waste, other refuse materials *and recyclable materials ....*" *Formerly* 53 P.S. §37409(e), *now* 11 Pa. C.S. §12409(e) (emphasis added). Thus, a recycling fee is otherwise authorized by statute for second and third class cities.

Nevertheless, whether authorized by some other statute or not, a home rule municipality's recycling ordinance may not be inconsistent with the provisions and purposes of Act 101. Section 304(b) of Act 101, 53 P.S. §4000.304(b). In addressing the question of inconsistency with Act 101, our recent decision in *Waste Management* is instructive.

In *Waste Management*, DEP and a county were parties. The legal question was whether Act 101 permits a county to rely on a third party's agreement to contribute financial or in-kind support to a county's recycling program. The third party support was a suggestion from a comprehensive sustainability study undertaken to address significant shortfalls in recycling funding. DEP approved the county's Act 101 plan revision which included the third party support. A group of vendors, who did not offer support in their competing bids, challenged the

_____

[13] Former Section 2409 was added by the Act of March 19, 2014, P.L. 52, 53 P.S. §37409, and is now codified as 11 Pa. C.S. §12409.

17

approval as inconsistent with Act 101. The Environmental Hearing Board (EHB) denied a motion for summary judgment by the disappointed vendors, and this Court allowed an interlocutory appeal.

Ultimately, this Court affirmed the denial of summary judgment and returned the matter to the EHB for a full hearing. In doing so, we noted DEP's assertion that it approves county-wide Act 101 "plans that provide for the maximum feasible development and implementation of recycling programs, as well as for the processing and disposal of municipal waste …." *Waste Management*, 107 A.3d at 280. We also noted one of Act 101's enumerated purposes is to "[e]stablish and maintain *a cooperative State and local program* of planning and technical and *financial assistance* for comprehensive municipal waste management." *Id*. at 285 (quoting Section 102(b)(1) of Act 101, 53 P.S. §4000.102(b)(1)) (emphasis added).

Finally, we held that, before trial, we could not determine as a matter of law whether the county's Act 101 plan "will have a negative impact on sustainability and ultimate self-sufficiency of its recycling program." *Waste Management*, 107 A.3d at 287 (citing Section 1513 of Act 101, 53 P.S. §4000.1513). We also held that it was "too early to determine as a matter of law whether the county's proposed plan will have a deleterious effect on the arguably 'topped-out' efficiencies of the [c]ounty's recycling program." *Id*. These determinations were important to a final conclusion about whether the innovative third party support was consistent with Act 101. *Id*.

In this case, the respected trial court did not have the benefit of our decision in *Waste Management* at the time it was called upon to decide the case based on stipulated facts. It is unfortunate that the current parties did not offer any

18

of Berks County's approved-Act 101 plans, or otherwise seek input from DEP, which is a crucial part of a cooperative State and local program. This is especially true where DEP must approve any plan that "provides for maximum feasible development and implementation of recycling programs." Section 505(b) of Act 101, 52 P.S. §4000.505(b); *accord Waste Management*, 107 A.3d at 278. And, DEP must assist municipalities in making recycling programs "financially self-sufficient." Section 1513 of Act 101, 53 P.S. §4000.1513. It is just this type of input that is essential to determine whether a recycling program has "topped-out" on its efficiencies. *See Waste Management*, 107 A.3d at 287.

As a final point, the trial court here clearly determined that the City's curbside recycling fee made the recycling program sustainable. However, the trial court did not address how, if at all, the fee impacted the ultimate financial self-sufficiency of the program or whether the program was as efficient as it could be. These latter points are obvious purposes of Act 101.[14]

In the absence of input from DEP, and in lieu of determinations regarding the effect of the City's curbside recycling fee on the financial self-sufficiency and efficiency of the recycling program, we vacate and remand to the trial court for further proceedings.

---

[14] We have doubts about whether the term "financially self-sufficient" as used in Section 1513 of Act 101, 53 P.S. §4000.1513 (development of recycling program plan) merely means operating without state grants. This is because the term is also used in conjunction with the phrase "market development" of recyclables. Therefore, an argument could be made that the goal of a financially self-sufficient recycling program is to be attained through market development rather than through user fees. Moreover, a user fee that covers all the costs of a recycling program undoubtedly makes the program self-sufficient regardless of state grants, but the fee is inconsistent with other provisions and purposes of Act 101. *Waste Management*; *Iezzi*. However, neither the parties nor the trial court addressed this issue, and we will not decide it now.

19

## B. The Third Class City Code
### 1. Contentions

Next, Residents maintain the City is no longer subject to the Third Class City Code because it adopted a home rule charter. The adoption of a home rule charter acts to remove a municipality from the operation of the code provisions enumerating the powers of that particular class of municipality. *Danzilli v. Lomeo*, 944 A.2d 813, 815 n.6 (Pa. Cmwlth. 2008); *Wecht v. Roddey*, 815 A.2d 1146, 1152 (Pa. Cmwlth. 2002), *appeal denied*, 827 A.2d 432 (Pa. 2003). Once a municipality adopts a home rule charter, "it is no longer a city of the second class, a county of the third class, a borough or a township of the first or second class, but a 'home rule municipality' and its 'code' is the [Home Rule Law]." *Danzilli*, 944 A.2d at 815 n.6. In other words, Residents maintain home rule municipalities may not cherry pick legal authority.

On this basis, Residents assert the City is governed by its charter under the Home Rule Law, and the Third Class City Code no longer applies. Consequently, the Third Class City Code's recent amendment to include recyclable materials in the definition of waste has no effect on the City's right to establish a service fee for recycling. As a home rule charter municipality, the City may operate any powers and perform any function not denied by the Constitution, statute or the home rule charter. Residents maintain the imposition of a recycling fee is at odds with Act 101 and is otherwise not authorized.

The City responds, despite the enactment of a home rule charter, the City "is a Third Class City." Joint Stipulation at ¶4; *see McSwain v. City of Farrell,* 624 A.2d 256, 258 (Pa. Cmwlth. 1993) ("[a]lthough the city has adopted a home rule charter, it is still a third class city"). Home rule municipalities have the broadest possible authority. Although a home rule municipality is not restrained

20

by its former municipal code, it is not prohibited from exercising powers provided thereunder.

The City maintains Residents' reliance on *Danzilli* and *Wecht* is misplaced. These cases hold home rule municipalities are not subject to the *limits* contained in their prior municipal codes. However, they do not stand for the proposition that a home rule municipality, with its broad powers, cannot avail itself of specific powers previously provided by its former municipal code.

According to the City, a hybrid approach is necessitated. Under this approach, while a particular code still applies, a home rule municipality has the power to supplement its terms under the home rule powers. *In re Condemnation by City of Coatesville*, 898 A.2d 1186, 1192 (Pa. Cmwlth. 2006)*; see McSwain*, 624 A.2d at 258. Although the Third Class City Code "shall not be construed as a limitation on the ability of a city" to adopt a home rule charter,[15] allowing the City to exercise the powers granted under a municipal code that indisputably applies to it is not a "limitation" on the City's powers under the Home Rule Law.

To the extent the City's powers under the Code are ambiguous, any ambiguities regarding home rule authority must be resolved in favor of the municipality. *Nutter v. Dougherty*, 938 A.2d 401, 414 (Pa. 2007); *County of Delaware v. Township of Middletown,* 511 A.2d 811, 813 (Pa. 1986). Prohibiting the City from exercising authority that it had when it was a non-home rule municipality would create an "anomalous [result] that third class cities which have not adopted home rule . . . are not prohibited from enacting this type of ordinance, but a similar city that has adopted home rule is prohibited." *Hartman v. City of*

_____

[15] *Formerly* Section 107 of the Third Class City Code, 53 P.S. §35107(b)(2), *now* 11 Pa. C.S. §10107.

21

*Allentow*n, 880 A.2d 737, 745 (Pa. Cmwlth. 2005). As discussed above, the Third Class City Code permits third class cities to impose recycling fees. *Formerly* 53 P.S. §37409(e), *now* 11 Pa. C.S. §12409(e). As the City remains a city of the third class operating under home rule, the City may exercise this statutory authority to impose a recycling fee.

## 2. Analysis

Under the Home Rule Law, a municipality that has "adopted a home rule charter may exercise any powers and perform any function not denied by the Constitution of Pennsylvania, by statute or by its home rule charter."[16] 53 Pa. C.S. §2961. A home rule charter municipality shall not exercise any "powers contrary to, or in limitation or enlargement of, powers granted by statutes which are applicable in every part of this Commonwealth." 53 Pa. C.S. §2962(c)(2). Statutes that are "uniform and applicable in every part of this Commonwealth" remain in effect and cannot be changed or modified by charter. 53 Pa. C.S. §2962(e).

"The essential principle underlying home rule is the transfer of authority to control certain municipal affairs from the state to the local level." *Hartman*, 880 A.2d at 742. "This transference results in home rule municipalities having broader powers of self-government than non-home rule municipalities." *Id.*

The grant of municipal power to a municipality governed by a home rule charter is "liberally construed in favor of the municipality." 53 Pa. C.S.

---

[16] The City's Home Rule Charter echoes this grant of power providing: "The City shall have the power to exercise any power or to perform any function not denied by the Constitution of the United States, by the Constitution of Pennsylvania, by act of the General Assembly of Pennsylvania, or by this Charter." Section 102 of the City's Home Rule Charter.

§2961; *accord Hartman*, 880 A.2d at 742. Indeed, a presumption exists that the exercise of power by a municipality is valid if no restriction is found in the Constitution, the charter itself, or the acts of the General Assembly. *In re: Pittsburgh Citizen Police Review Board*, 36 A.3d 631 (Pa. Cmwlth. 2011), *appeal denied*, 44 A.3d 1163 (Pa. 2012); *Wecht*, 815 A.2d at 1151. Thus, we look for direct conflict between the home rule enactment and the Constitution, the home rule charter, or the statute. *Wecht*, 815 A.2d at 1151.

Residents rely on *Wecht* and *Danzilli* in support of their position that the Third Class City Code no longer applies. In *Wecht*, we held the Second Class County Code[17] did not supersede the Allegheny County Home Rule Administrative Code. 815 A.2d at 1152. We explained the Second Class County Code is not an act of the General Assembly 'applicable in every part of this Commonwealth'" so as to come within the enabling law limitation. *Id.* (citing Section 3107-C(j) of the Second Class County Code[18]). In other words, Allegheny County was not *limited or restrained* by its former code. *See id.* "In general, the adoption of a home rule charter acts to remove a municipality from the operation of the code provisions enumerating the powers of that particular class of municipality." *Id.* "*[I]n the absence of explicit constraint* or collateral effect on another municipality, there will be *no conflict* between the home rule municipality's actions and the former code provisions, since the latter no longer apply." *Id.* (emphasis added).[19]

---

[17] Act of July 28, 1953, P.L. 723, *as amended,* 16 P.S. §§3101-6302.

[18] Added by the Act of May 20, 1997, P.L. 149, *as amended,* 16 P.S. §6107-C(j).

[19] Although this Court in *Iezzi* relied on *Wecht* in determining the Third Class City Code did not apply to the City because it adopted a home rule charter, such determination was not significant to our ruling. This is because we concluded the Third Class City Code, as it existed prior to the 2014 amendment, did not authorize recycling fees, and the fees, which covered all costs of recycling, were inconsistent with the provisions and purposes of Act 101. *Iezzi*, 78 A.2d at 1267.

23

Similarly, in *Danzilli*, we held, once a borough adopts a home rule charter, it is a home rule municipality governed by the Home Rule Law, and it is no longer a borough governed by the Borough Code.[20] In absence of direct conflict with a statute applicable throughout the Commonwealth, a home rule charter provision is presumed valid and, therefore, prevails over a Borough Code provision. *Id.*

For its part, the City relies on *McSwain* and *Coatesville*. In *McSwain*, a third-class city operating under a home rule charter filed an action in assumpsit against a property owner in order to recover for delinquent sewer and garbage removal fees. The issue was whether the city may properly bring an *in personam* action in assumpsit to recover the fees as this was not permitted by the Third Class City Code. We opined, "[a]lthough the city has adopted a home rule charter, it is still a third class city." *McSwain*, 624 A.2d at 258. Although we determined the city did not have the power under the Third Class City Code to bring actions in assumpsit, it had the right to proceed in assumpsit under the broad powers granted to it as a home rule municipality. *Id.* In essence, an action in assumpsit was not denied by the Constitution of Pennsylvania, by a statute applicable in every part of the Commonwealth or by the charter. *Id.*

In *Coatesville*, an estate challenged a city's ability to condemn property under the Third Class City Code because the city was a home rule municipality, and it did not have the power to condemn the property for a recreational facility because it was a proprietary business, not a public purpose. The trial court determined, even though the city was a home rule municipality, it

---

[20] 8 Pa. C.S. §§101-3501.

still had the power to condemn property for a public golf course and other attendant recreational purposes.

On appeal, we considered the relationship between various municipal and county codes to home rule municipalities and examined whether the Third Class City Code's authorization to take property remained in effect. We recognized three different approaches to determining whether a city or county code applies to a home rule charter municipality applied by the courts. *Coatesville*, 898 A.2d at 1192. Specifically,

> [I]n some cases we have held that a home rule municipality is free to adopt measures in contravention of the particular code that used to apply prior to its adoption of a home rule charter. ... In other cases, though, we have held that an individual county or city code is applicable to every part of the Commonwealth, and the home rule municipality is not allowed to change those procedures. ... Yet, in other cases, we have adopted what can best be described as a hybrid approach, holding that while a particular code still applies, a home rule municipality has the power to supplement its terms under its home rule powers.

*Id.* (citations omitted).

Ultimately, we did not resolve the inconsistency because we decided, regardless of the approach, the city still had the power to take the property. "If the Third Class City Code still applies, then there is no dispute that the [c]ity has the power to take the [p]roperty; if it does not apply, then the [c]ity has the power to take under the broad and expansive powers given to it under home rule because there is no uniform law applicable to all parts of the Commonwealth that would preclude the taking." *Id.* On this basis, we affirmed. *Id.* at 1193.

In essence, although home rule cities may not be *limited or restrained* by their former municipal codes, there is no law preventing a home rule charter

25

from exercising powers bestowed by its former code. *See Hartman*, 880 A.2d at 745. Given that a home rule municipality is to have broader authority than a non-home rule municipality, and in light of the policy and purpose underlying home rule authority, we see no reason why the City may not exercise the powers granted under its former municipal code, particularly when such provisions are necessary to comply with Act 101's mandates. Any other result would unnecessarily restrict municipal autonomy.

Notwithstanding, we must determine whether there is a direct conflict between the City's ordinances, which authorize fees for curbside recycling, and Act 101, a statute applicable throughout the Commonwealth. As discussed above, Act 101 is silent with regard to curbside recycling fees. Although we have struck down various fees, we ultimately held "Act 101 does not preempt other local fees which *are otherwise permitted by statute* and which *are not inconsistent with Act 101's provisions and purposes*." *Monroe County*, 80 A.3d at 561 (emphasis added). The General Assembly authorized second and third class cities to impose recycling fees in its amendments to the Second and Third Class City Codes. In light of this legislative authority, we conclude the recycling fees are "otherwise permitted by statute."

Nevertheless, whether authorized by statute or not, a City ordinance must not be inconsistent with the provisions and purposes of Act 101; otherwise, it is preempted. As discussed above, a remand is necessary to determine whether the City's recycling fees are inconsistent with Act 101's provisions and purposes.

### C. Other Municipalities' Recycling Programs
### 1. Contentions

Next, Residents argue the trial court erred by relying on fees imposed by other local governments to uphold the City's fee. Residents assert the

26

implementation of recycling fees by other local governments has no bearing on the legality of the City's ordinances. The other local governments may come under different codes and charters. Moreover, it is unclear whether the fees imposed by other local governments would survive if challenged. They claim it should not be their burden to identify municipalities that do not charge a service fee to fund the operation of their recycling programs. Notwithstanding, Residents point out that the City of Scranton does not charge a service fee to fund its recycling program; but rather, it funds the program through its General Fund and DEP performance grants.

In addition, Residents assert, if the City cannot fund its recycling program without the imposition of a service fee, the City may opt out of the recycling program. Finally, they claim the inability of some local governments to implement their recycling program without charging a recycling fee is an issue for the General Assembly, not this Court. Until such time as the General Assembly amends Act 101, the City has no right to impose a recycling fee on its property or business owners.

The City responds that the trial court properly examined information from other municipalities as confirming the City's experience. None of the six cities examined accomplished a "self-sustained" recycling program. The experience of the other cities shows there is nothing unusual or inefficient about the City's case. Significantly, it illustrates how mandated municipalities would struggle to sustain their recycling programs without a user fee. As the trial court found, "it is clear that funds, grants and marketing of recyclables alone, as suggested by [Residents] as the sole means permitted by Act 101 of paying for recycling, is infeasible." Trial Court Opinion at 9. As for Residents' claim that

Scranton does not charge a service fee to fund its recycling program, the City explains Scranton assesses an annual waste disposal fee to cover the cost of its waste disposal services (including curbside recycling). The receipts from this fee are deposited in Scranton's General Fund, which is then used to pay all the costs of Scranton's curbside recycling collection. To argue that Scranton does not collect a fee to support its curbside recycling program is sophistry.

Further, the City argues, if Residents' "other alternatives," discussed below, were anything other than ephemeral, then at least one of these municipalities would have opted to take them, rather than enact a fee on its residents. None of the six cities listed have been able to accomplish a self-sustaining recycling program without the imposition of fees.

## 2. Analysis

Here, at the trial court's request, the parties submitted supplemental stipulations regarding Act 101 funding and how other similarly-situated municipalities fund their recycling programs. Contrary to Residents' assertions, the trial court did not rely on the fees imposed by other local governments to uphold the City's fee. Rather, the trial court determined the City's ordinances are not inconsistent with Act 101 and are authorized by the Third Class City Code. The trial court merely considered the collective experience of other municipalities in determining the availability of state funding and their ability to self-sustain recycling programs without imposing a curbside fee. In other cases before this Court, we did not have as much information regarding the availability of state

28

funding. *See, e.g., Waste Management*; *Iezzi*. Therefore, the trial court did not abuse its discretion with regard to this information.[21]

### D. Alternative Options
### 1. Contentions

Finally, Residents maintain the City disregarded alternative options to fund the recycling program. When the General Assembly enacted Act 101, it devised a clear pathway for municipalities to fund their recycling programs, which did not include imposing a recycling fee under Act 101. Act 101 provides grant funding to pay for the costs of the recycling program. It also enabled municipalities to operate their own resource recovery facilities or non-curbside recycling program. *See* 53 P.S. §§4000.1301, 4000.1501(h). They claim Act 101 allows a municipality to discontinue its program if the costs to operate the program are excessive. 53 P.S. §4000.1712.

Residents assert, although the City applied for some grants through Act 101, it did not exhaust all available opportunities to obtain grants. For instance, the City did not seek Section 902 grants from 2009 through 2011. It did not avail itself of the other funding alternatives, such as a resource recovery facility or non-curbside recycling. Instead, it chose to implement proscribed service fees, which constitute $2.3 million of its $2.4 million budget to operate the program.

The City defends that Residents' alternatives are more theoretical than real. According to the City, Residents offer nothing but speculation and conjecture regarding the existence of these "alternatives" and invites the City to negate them.

---

[21] We see no merit in the City's argument that the City of Scranton collects a user fee for collection of recyclables. *See* Supplemental Stipulation ¶43, R.R. at 351a. To the extent the trial court determined otherwise, its determination is not supported by substantial evidence.

With regard to Residents' claim the City did not seek Section 902 grants from 2009 through 2011, Section 902 grants may only be used to identify markets, develop a public education campaign, or purchase collection, processing and storage equipment. 25 Pa. Code §272.331. Municipalities are specifically prohibited from using Section 902 grants to cover maintenance costs or direct salaries. 25 Pa. Code §272.332. Further, municipalities cannot apply for Section 902 grants on an annual basis, and the grants themselves are limited to a maximum of $250,000. 44 Pa. Bulletin 2708 (May 3, 2014); Joint Stipulation at ¶47. Because the City applied for Section 902 grant funds in 2008, the earliest it could have sought additional funds was 2010, and then not again until 2012, which it did. Joint Stipulation at ¶¶65, 66. Residents do not suggest how an extra $250,000 of limited use grant funds would help defray an annual structural operating deficit of over $2 million.

With regard to Section 904 grants, the City explains they are performance grants awarded based on the total weight of recyclable materials that are collected within the municipality and which are actually marketed. 53 P.S. §4000.904(b); Joint Stipulation at ¶¶51, 52. From 2000 to 2011, the average annual amount of performance grant awarded under Section 904 was $157,321, and the most the City received in a single year during that period was $203,502 in 2010. Joint Stipulation at ¶¶73-88. Since 2011, DEP reduced all award amounts to 60% of the original amount; as a result, the City received grant awards of $86,132 for 2010, $96,168 for 2011, and $86,760 for 2013. *Id.* at ¶¶84-87.

The City also rejects Residents' claim that the City could have, but did not, apply for permission to operate an alternative program to curbside recycling under Section 1501(h) of Act 101, 53 P.S. §4000.1501(h). Section

1501(h) is not an open invitation to municipalities to explore a variety of potential alternatives to the standard "source-separation and collection program for recyclable materials." 53 P.S. §4000.1501(a). Residents did not show whether this alternative is available to the City and if so, whether the City could establish and sustain the program without charging the contested fee.

The City likewise rejects Residents' claim the City could have opened its own resource recovery facility to take advantage of the fee permitted under Section 1301 paid by operators of such facilities. According to the City, resource recovery facilities have nothing to do with recycling. In fact, Act 101 specifically excludes recycling. Section 103 of Act 101, 53 P.S. §4000.103. Therefore, "Residents' assertion that '[t]he City could have opened [its] own resource recovery facility in order to generate revenues to fund the recycling program' or sold 'recyclable materials deposited at the facility' is a fallacy. Appellees' Brief at 38 (citing Appellants' Brief at 34).

Finally, City maintains Section 1712 of Act 101 does not provide a "right" to discontinue the program when the costs of the program become excessive, but merely provides "an affirmative defense." This affirmative defense does not exempt municipalities from compliance with Section 1501's mandatory recycling provisions, nor does it give them a "right" to opt out. To the contrary, Section 1712(a) only provides an affirmative defense to certain types of enforcement actions brought by DEP.

Notwithstanding, Residents presented no evidence to the trial court that any of these "alternatives" remotely approach the generation of funds necessary to displace the City's curbside recycling fee.

## 2. Analysis

The City is eligible for two types of Act 101 grants under Sections 902 and 904. Section 902 grants are awarded "for development and implementation of municipal recycling programs" and "may be used to identify markets, develop a public education campaign, purchase collection and storage equipment and do other things necessary to establish a municipal recycling program." 53 P.S. §4000.902(a). However, Section 902 grants are not available on an annual basis. *See* 44 Pa. Bulletin 2708 (May 3, 2014). Consequently, a municipality may not apply for Section 902 grants in consecutive years. *Id.*

Section 904 grants are performance grants "based on the type and weight of source-separated recyclable materials ... that were recycled in the previous calendar year, and the population of the municipality." 53 P.S. §4000.904(b). A municipality may apply for Section 904 grants annually. 53 P.S. §4000.904(a).

Section 902 and 904 grants are funded by the Act 101's recycling fund. Section 706 of Act 101, 53 P.S. §4000.706; *Waste Management*, 107 A.3d at 283. The recycling fund itself is funded by a $2 per ton fee on disposal facilities. Section 706 of Act 101, 53 P.S. §4000.706; *Waste Management*, 107 A.3d at 283. The General Assembly did not intend the Recycling Fund to be the long-term mechanism for supporting Act 101's programs. *Waste Management*, 107 A.3d at 284. In fact, Act 101 provides a sunset provision for the $2 fee, directing its termination after January 1, 2020. Section 701(d) of Act 101, 53 P.S. §4000.701(d); *Waste Management*, 107 A.3d at 284. The end goal is to make recycling programs "financially self-sufficient." *See* Section 1513 of Act 101, 53 P.S. §4000.1513. "However, it is contemplated that self-sufficiency may be beyond the capabilities of municipalities and the Department, ultimately requiring

further legislative action. *Waste Management*, 107 A.3d at 284; *see* 53 P.S. §4000.1513(4)).

Here, the City previously applied for Section 902 grants and it received awards in 2005 ($438,750), 2008 ($250,852), and 2012 ($242,039). Joint Stipulation at ¶¶54, 59, 61. The City was not eligible to apply for a Section 902 grant until 2014. With regard to Section 904 grants, on average, the City receives less than $100,000 in Section 904 grants. Joint Stipulation at ¶¶85-87.

Upon review, there is no support for Residents' bald assertions that the City did not fully avail itself of this grant money. Even if the City may have qualified for more grant money, it is clear that grant money alone cannot fund the gap. As demonstrated by DEP's reduction of award amounts, the recycling fund coffers are limited.

As for the other alternatives advanced by Residents, Section 1501(h) of Act 101, 53 P.S. §4000.1501(h), provides a single alternative to the standard "source-separation and collection program for recyclable materials." 53 P.S. §4000.1501(a). A mandated municipality can comply with its source separation and collection obligations through the use of a recycling facility, so long as:

> (1) Materials separated, collected, recovered or created by the recycling facility can be marketed as readily as materials collected through a curbside recycling program.
> (2) The mechanical separation technology used in the recycling facility has been demonstrated to be effective for the life of operations at the facility.

53 P.S. §4000.1501(h). Residents did not show whether this alternative is available to the City, and more importantly, whether this alternative could be sustained without charging a fee.

33

As for Residents' claim that the City could have opened its own resource recovery facility to fund the recycling program, a resource facility excludes recycling. Specifically, Section 103 of Act 101 defines a "resource recovery facility" as:

> A processing facility that provides for the extraction and utilization of materials or energy from municipal waste that is generated offsite, including, but not limited to, a facility that mechanically extracts materials from municipal waste, a combustion facility that converts the organic fraction of municipal waste to usable energy, and any chemical and biological process that converts municipal waste into a fuel product. The term also includes any facility for the combustion of municipal waste that is generated offsite, whether or not the facility is operated to recover energy. *The term does not include*:
>
> ***
>
> (3) *Any separation and collection center, drop-off point or collection center for recycling*, or any source separation or collection center for composting leaf waste.

53 P.S. §4000.103 (emphasis added).

Finally, contrary to Residents' assertions that the City has a "right" to discontinue the program when the program costs are excessive, Section 1712 of Act 101 provides "an affirmative defense." Specifically, this section provides:

> It shall be an *affirmative defense* to any action by the department ... against any municipality alleged to be in violation of section 1501 that *such municipality's failure to comply is caused by excessive costs of the program required by section 1501*. Program costs are excessive when reasonable and necessary costs of operating the program exceed income from the sale or use of collected material, grant money received from the department pursuant to section 902 and avoided costs of municipal waste processing or disposal.

34

53 P.S. §4000.1712(a) (emphasis added). This section is merely a defense against certain types of enforcement actions, not a right to opt out of its mandated responsibilities under Section 1501(a). *See id.*

Notwithstanding, the City here did not offer evidence of a sustainability study that presented alternate methods to make up funding deficits. *See Waste Management*, 107 A.3d at 275. There is no stipulated fact that the City sought private third party support for its recycling program.

## IV. Conclusion

Accordingly, we vacate and remand for more analysis of the preemption issue, consistent with our recent decision in *Waste Management*. In particular, further inquiry is necessary as to whether the curbside recycling fee will have a negative impact on the recycling program's financial self-sufficiency, as that term is used in Act 101, or a deleterious effect on the efficiencies of the City's recycling program.

_____
MICHAEL H. WOJCIK, Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Alan Ziegler and Nicolas Bene and     :
Lissette Chevalier and Jose Munoz,     : No. 10 C.D. 2015
and Efrain Caban, Individually and     :
on behalf of all similarly situated persons,     :
    :
                 Appellants     :
    :
             v.     :
    :
City of Reading and Reading     :
Area Water Authority     :

# O R D E R

AND NOW, this 20th day of April, 2016, we VACATE the order of the Court of Common Pleas of Berks County, dated December 15, 2014, and we REMAND for further proceedings consistent with the foregoing opinion.

Jurisdiction is relinquished.

MICHAEL H. WOJCIK, Judge